Sarfaty *v.* Sarfaty.

---

Moses D. Sarfaty

*v.*

Eva Sarfaty.

[Filed January 24th, 1900.]

1. Neither unkind and inconsiderate treatment (not amounting to that degree of extreme cruelty which would sustain a decree for divorce *a mensa et thoro*) nor a single instance of physical violence, happening two years before the wife departed, with no proof of a continuity of like treatment, nor an order by the husband to the wife to leave his house, given in the course of a quarrel, but not in any way renewed or enforced, the wife leaving two weeks thereafter, in the husband's absence and without his knowledge, is sufficient cause to justify a wife in deserting her husband.

2. In order to constitute a desertion the separation must be against the will of the complaining party. It does not lie with one who consents to or approves of the separation to complain of it as a desertion.

3. A desertion by a wife is not obstinate where the letters sent her by the husband during the alleged two years of desertion exhibit neither desire nor willingness that she should return to him, and one of them proposes that she let him get a divorce quietly.

13

On bill for divorce for desertion, answer and proofs.

The complainant in this bill states his marriage with the defendant on August 16th, 1876; his residence at Hilltop, Camden county, New Jersey, since August 1st, 1883, and that the defendant deserted him there on May 1st, 1895, since which date she has not returned to his residence, and he prays a decree for absolute divorce.

The defendant, in her answer, denies the desertion complained of, and declares that she was driven from the home of the complainant on May 1st, 1895, by his cruel treatment, and that she has remained away through fear; that prior to the date named the complainant dealt harshly with her and neglected properly to provide for her and her children, and that, by reason of his cruel treatment, her health was permanently impaired.

*Mr. Henry I. Budd, Jr.*, for the complainant.

*Messrs. Bacot & Record*, with whom was *Mr. Phillips* (of the New York bar), for the defendant.

GREY, V. C.

The complainant was married to the defendant in August, 1876. They took up their residence in New Jersey on August 1st, 1883, having theretofore resided in Philadelphia, Pennsylvania.

The desertion complained of occurred on May 1st, 1895, at which time the complainant's family consisted of five children, a sixth having died two years before. On the date named the wife, with three children, left her husband's residence and the village where he resided, from a railroad station not used by him, and in his absence from home, and, he says, without his consent or knowledge. Since that date the husband and wife have not seen each other. She has been living in New York with the three children, supported by her family.

The wife says that she was justified in leaving her husband and in remaining away from him. Her story is this: Shortly

Sarfaty v. Sarfaty.

after their marriage, complainant began to show indifference toward her, when they were residing at a boarding-house, and afterwards, while they were living with his mother in Philadelphia, he neglected her and failed properly to clothe and support her. At his mother's house he left her alone throughout the evenings; the rooms there occupied were too small for the growing family; he did not furnish sufficient servants; she was compelled to do work to which she had not been accustomed; he bought a country place in New Jersey against her wish, and after they took up their residence there his conduct to her became more and more unbearable; he failed properly to support and clothe her there, and during a large part of the time between 1883 and 1895, she did the whole of the housework and had the care of all the children without any assistance; the supply of food was not sufficient and he would find fault with the grocery and butcher bills, &c.; she was compelled to clear away snow in the winter and to use a pump the handle of which could be worked only with extreme labor; he was harsh and cross to the children; his language to her was offensive; he frequently beat and maltreated the children, and on one occasion struck his son with a saw, cutting open his cheek; on another occasion he struck him with a chain, on the hand, and injured him severely; once, for some trivial offence, he struck his daughter in the face. The defendant says these acts of the complainant resulted in seriously impairing her health. About two years before the desertion complained of, defendant says she was attending the baby one night, when complainant became exceedingly provoked at its continued crying and defendant's inability to quiet it. He found some fault with her, and upon replying that he should have patience he seized her by the throat and choked her, whereat she screamed. There was considerable friction between the husband and wife over money matters. She had left to her some $8,000 or $10,000, which she loaned him and was never able to get back.

Her story of the immediate cause of her departure from his home is this: Complainant came home one night with a fish which he wished her to pickle. She explained her inability to

do so, being worn out from work about the house. Later, at the supper table, he asked for the fish, and when he was told that she had been unable to comply with his wishes he gave way to his temper, became very abusive and told her to leave his house, and that if she did not do so he would put her out. The occurrence is confirmed by the testimony of the oldest son and daughter. Defendant replied she would go as soon as she could get ready. This episode happened about two weeks before her departure. She was, she says, during that time, packing and getting ready to go.

The complainant denies defendant's story in all of the above details. He says he never treated her with indifference or called her vile names; that he always gave her plenty of money and supplied her with sufficient clothing; that he never neglected her, but was always affectionate to her and the children, whom he dearly loved, and he expressly denies the statement of the fish episode. He declares he never told her to leave his house. On the contrary, he testifies that he did not know that she was going and was amazed to find she had gone. As to money matters, he says his wife's money was invested at her request, in stocks, and was lost.

After defendant left complainant's house, in May, 1895, the parties had no personal interview before the bringing of this suit. Evidence of complainant's purpose and state of mind is disclosed only by letters written by him to his wife, whereby he says he endeavored to persuade her to return to him.

The circumstances narrated did not justify the wife in abandoning her husband's house. If it were true that, in the heat of the quarrel about the failure to prepare the fish, he told her to leave his house, and that if she did not he would put her out, it is equally true that she remained for two weeks thereafter, with no further step, by either word or action on his part, toward carrying out his threat. At the time of her departure she was under neither fear nor compulsion. Her husband was not present. The weight of the evidence goes to show that he did not know she intended to leave. Her selection of a route of travel on which she would probably not meet him, indicates

Sarfaty *v.* Sarfaty.

that she concealed her leaving from him and a consciousness on her part that he did not wish her to leave him.   The circum-stances detailed would not have entitled her to a divorce from him on the ground of extreme cruelty.   His conduct towards her was not such as to constitute desertion, of that sort where the husband compels the separation.   In *Wulff* v. *Wulff, N. J. L. J. 204 (1898)*, Vice-Chancellor Pitney held that to justify desertion required the same degree of cruelty as would be neces-sary to sustain a divorce on that ground.   The only instance of physical violence towards the wife was shown two years before she left her husband, and the quarrel resulting in his order that she should go, was two weeks before her departure.   That there was inconsiderate and unkind treatment by the husband towards the wife is too apparent, and his conduct cannot be held to be undeserving of blame, but the proof is not satisfying to show that it either produced in the wife a condition of terror or that, at the time of the separation, it had undermined her health. The weight of the testimony is that there were contentions and ill feeling between the parties, to which the husband contributed his full share, and it is probable that during one of these quar-rels he told her to leave his house.   The only physical violence towards the wife and the hasty and ill-tempered command that she should leave were both too remote to have seriously influ-enced her departure.   There is no proof of any further act done by the husband which indicated a purpose to drive the wife away, nor that she believed, when she went, that she was in any danger of violence at his hands.   She left her husband deliber-ately and of her own free choice, provoked to it, no doubt, by her unhappy situation.   She might, however, had she chosen so to do, have remained to suffer the discomfort of his further selfishness.   This was the " for worse " which, by her marriage contract, she undertook to bear and for which the law affords no remedy.   Neither extreme cruelty such as the law takes cog-nizance of, nor the husband's compulsion, occasioned the wife's departure.

While the evidence does not show that the act of the wife in leaving her home was compelled, the attitude of the husband,

both before and after she left, indicates that it did not meet with his disapproval. When he returned to his home and found that she had gone he made no effort to induce her to return. He knew she was at her mother's house in New York, but a few hours' journey from him, yet he did not go to see her to ask her to come back. He wrote her several letters, which, in the flood of contradictory parol testimony, afford a few islands of indubitable proof.

In none of these letters does the husband indicate any regret at the wife's departure or any desire that she should return to him. On the contrary, the trend of them all is towards some arrangement for a divorce upon terms to be dictated by him or the obtaining of her signature to his deeds disposing of his lands.

A summary of these letters of the husband to the wife will show his position as to her absence by proof of his own making. His first letter to his wife after her departure from his house simply sought to ascertain whether Mrs. Sarfaty would sign a deed for a certain property. It contained no other suggestion of any kind. Several other letters, pertinent to the same matter, contain no suggestion of a change in their marital relations nor of any desire or willingness to have her return to him. In a letter of July 5th, 1895, he says: "I will not attempt to make any more deals that require your signature until I am in a position to dispense with it." In a letter dated July 8th, 1895, he says that if Mrs. Sarfaty had been where she ought it would not have happened, referring to his failure to put the deal through. In a letter of the 10th of July, 1895, he tells her she is even a bigger fool than he thought her—

"I have made a fool of myself, waiting so long, but I could not bring myself to disgrace my children. I do not suppose I can get a divorce before September, but I will see my lawyer and see what can be done. I shall apply for the custody of the three younger children, as I would not have them brought up by such an unnatural mother."

He writes that his lawyer says he has a plain case and there will be no trouble, and as she seems so remarkably anxious for

Sarfaty *v.* Sarfaty.

it, no doubt she would do everything in her power to hurry it up.   In a later letter—August 5th, 1895—he writes: "If you will let me get a divorce quietly and give me custody of the three younger children I will give you everything I have in the world except the house and lot at Hilltop," and he gives as his reason for such a proposition that he does not want to get into a prolonged fight with her if it can be avoided.   "In a fight with you I would beggar myself and you but that I would get justice."   Again he says:

"If fight there must be I have everything ready to commence my suit against you and also a suit for damage against some one else, and before I get through I will have my rights.   I wish your answer at once," &c."

In a letter dated August 7th, 1895, to the brother-in-law of the defendant, his evident purpose is to recover the children, but there is nothing to show a willingness or desire to have his wife return to him.   He says: "In a fight I can get a divorce and the custody of my children.   Any fight with me will of necessity go on until I win or have nothing left to fight with." He offered his wife every cent he had in the world except a house, on certain conditions: "My children shall not be brought up to hate me.   I have no one in the world to love.   There is no doubt the court would give them to me."   He says:

"My wife knows where I live, and I will give respectful attention to any. thing she may write.   I have everything ready for a suit for divorce and the custody of my children and also a damage suit.   For reasons stated above I do not want to fight.   My wife has been away so long the people are beginning to talk, and the first breath of scandal would start me."

It is, he writes, for his wife to say, and say quickly, what it shall be.   He says his wife holds an awful power over him, which is the children, and for the love of them he has hesitated. Again he writes the brother-in-law, on August 13th, 1895, that if his wife and himself do not reach a complete understanding that week he would commence suit for divorce on August 19th. Any communication must come from his wife direct, and after that nothing she might say would have any effect..   He closes his letter with a veiled threat of some scandalous matter affect-

ing his wife, which he might disclose in case he should have to sue. His last warning is—knowing his weakness and love for his children, he has just taken an oath on the Bible to commence suit on August 19th unless an understanding is reached before that time, and no power on earth would make him break an oath. There were further letters from him to his wife, none of which discloses the slightest desire or intention on his part to have her return to him. His later letters all contain threats more or less veiled—that he will give his wife "a taste of the law," &c.; "she is a fool," &c. In his letter of the 24th of December, 1895, he says: "We could be divorced quietly. * * * If you will obey me and do exactly what I say, well and good; if not, let those you do obey take the consequences." In a letter dated June 23d, 1896, he says:

"If you will send me the three younger children I will make any settlement regarding money matters in my power. As you do not wish to live with me you can have a home elsewhere. This is now your last chance for an amicable settlement. If you now refuse to accept my proposition my suit against your family and yourself shall be pushed to the bitter end."

On the 11th of May, 1897, he wrote that divorce proceedings had commenced, and asked her if she had any proposition to make. This statement that divorce proceedings had commenced was false in fact, and probably to the knowledge of the complainant, for he did not swear to the bill until May 20th, 1897, nine days after he wrote this letter, and the bill was filed on the same day. She replied, on May 13th, 1897, that her proposition was that if he wished to reach any adjustment he should meet her at once at some place in New York, not objectionable to either. In answer to her letter he says, in his letter of May 14th, 1895: "I have no propositions to make, but I will hear any proposition you make and try and treat it clearly and fairly." She would have to meet him on Monday; that he would not come to New York, as it was her place to come to him, and if she came she must come alone.

These letters of the husband show a continuously vindictive spirit and an entire willingness, not only that his wife should live separately but an actual anxiety for a divorce. No one of

them displays an effort to persuade the wife to return to him. It is quite evident they were not written for that purpose, but to compel the wife to sign conveyances or to arrange for a divorce upon terms to be dictated by him.   These results were to be accomplished not by gentle means but by the threats of suits to be brought against the wife and her mother.   There is neither any direct suggestion that the husband desired the wife to return to him nor any proposition looking to that end.   It is also due to her to say that in the whole case there is not a particle of evidence which casts a shadow upon her character.

Under these circumstances it is clear that the husband made no honest endeavor to have his wife return to him.   His letters were written in a spirit indicating a purpose to keep her away. One of his letters shows that he contemplated a divorce with equanimity if only he could have three of the children, and in another he actually made a direct proposition that she permit him to get a divorce and make no defence.

It was after receiving such letters as these, covering nearly the whole period of her separation from her husband, that he wrote to her, falsely stating that he had begun proceedings for divorce, and asked her if she had any proposition to make.   He thus drew from her an indication of what her disposition was in view of an actual suit against her for divorce.   She answered, writing him to come and see her in New York if he wished to adjust their matters.   This letter was received by the husband before he had in fact begun this suit, and made known to him that his wife was willing to confer with him for an adjustment. He was probably now acting under legal advice and knew that the two years of her absence had expired, and that any show of willingness on her part to return to him would spoil the obstinacy of her desertion.   He then wrote her in reply, refusing to come and see her, telling her it was her place to come to him, and that if she came she must come alone.   As might have been expected, she did not come alone from New York to Philadelphia to see him, and about a week after the husband's last letter he filed his bill in this cause.

These being the relations of the parties according to the proofs,

Sarfaty *v.* Sarfaty.

do they justify a decree that the wife willfully, continuously and obstinately deserted the husband for the period of two years?

In the case of *Bowlby* v. *Bowlby, 10 C. E. Gr. 406,* this court declared that though a desertion by a wife may have been willful in the first instance, it could not be obstinate unless it was persisted in against effort or influence on her husband's part to bring the desertion to an end. *Cornish* v. *Cornish, 8 C. E. Gr. 208,* was cited as supporting that view. The case was taken to the court of appeals (*10 C. E. Gr. 570*), and was there affirmed on the opinion of this court. In *Herold* v. *Herold, 2 Dick. Ch. Rep. 210,* the principle was again applied, and it declared that when the husband was not entirely blameless for the act of the wife, and he makes no effort to prevent her desertion of him and acquiesces in and appears satisfied with its continuance, he is not entitled to a divorce. In *Costill* v. *Costill, 2 Dick. Ch. Rep. 349,* it was again declared that if a husband does nothing to induce his wife to return to him, even when she separates from him without sufficient cause, her desertion will not be deemed to be obstinate.

Through all these cases the principle is recognized that the separation of the parties, in order to constitute desertion, must be against the will of the party complaining. It is quite obvious that if there is an acquiescence or approval of the separation by the party who complains, it does not lie with him to make the matter done with his consent, the basis for the dissolution of the marriage contract.

In this case the complainant's own treatment of his wife, though not sufficiently harsh to justify the separation, was undoubtedly a provoking cause thereto. His conduct after the wife left indicated no desire on his part that she should return, nor even a willingness to receive her. His letters to her, considerable in number, and running over nearly all of the two years during which he claims she continuously and obstinately deserted him, shows toward her, not that treatment which a just man should extend to his wife, who had impatiently and unadvisedly separated from him, but a willingness on his part that she should stay away, and one letter proposes a collusive divorce.

Counsel for complainant lays special stress upon what he says was an effort on Mr. Sarfaty's part to have his wife return to him, when he retained a law firm in New York with what he claims was a purpose to effect a reconciliation. The letter of instruction, written by complainant to his New York counsel, directed that prior to instituting any legal proceedings against his wife and her family, they should take steps to obtain an amicable settlement with her, but expressly stipulating that his wife and children must return to him at once, and that there be no further communication whatever between his wife and her family, except through him. It is not clear that this offer was ever communicated to the wife, or that she knew he had sent it. The conditions which the husband imposed were that the wife should abandon all communication with her family, except through him. The wife knew that the husband held her family in abhorrence, and that he accused them, wrongfully it appears, of alienating her from him. Such an unreasonable condition destroyed any effect that such a message might possibly have had as an indication of a purpose on his part to have his wife come back. He must certainly have foreseen that such a condition was very unlikely to bring peace and good will between them or to lead to her return. Nor was it in any way reasonable that his wife should be required, as a condition of her reception by her husband, to have no further communication with her mother and family, except through the husband who hated them. Her mother had practically supported her during the separation, but does not appear to have induced it, or to have exercised any influence over the wife to prejudice her against her husband. In his testimony the husband says he has always been willing to have his wife return to him, but only upon the express condition that she have no further communication with her family, except through him; but his various letters, written during the separation, do not support his testimony. The message which he claims he sent through his New York counsel seems more evidential of a purpose to keep the wife where she was than to induce her to return. The condition itself was unfair and unreasonable.

There has been no sufficient evidence that the defendant, against the will of the complainant, obstinately deserted him for the period of two years.

Incidental to his application for divorce, the complainant has filed a petition in this cause asking possession of the children of the marriage, who are with their mother in New York. The consideration of this petition is dependent upon the application for divorce now under consideration. That failing, the petition for custody of the children must also fail and be disposed of as an original and independent matter.

Upon the whole case the complainant has not proven that the wife's separation was a willful, continued and obstinate desertion. There should be a decree that complainant's bill be dismissed, with costs.