# MINNIE RUCKLE

*vs.*

# WALTER L. RUCKLE.

*Divorce—Adultery—Desertion—Cessation of Intercourse.*

On a proceeding by the wife for divorce, *held* that the evidence did not show the husband to have been guilty of adultery.            pp. 208-211

That the husband ceased to sleep in his wife's bedroom, and thereafter occupied another room, *held* not to involve a desertion by him of his wife, he testifying that in moving into another room he had no intention of severing the marital relation, and she testifying that she refused to visit him in such other room, though requested to do so.     pp. 212-215

Evidence that on several occasions the husband used more or less violence against his wife, following heated arguments between them, *held* not sufficient to warrant a partial divorce, in view of the fact that these occurrences were not only long before the filing of the bill, but also before the husband's cessation of intercourse with the wife.     p. 212

*Decided June 21st, 1922.*

Appeal from the Circuit Court of Baltimore City (HEUISLER, J.).

Bill by Minnie Ruckle against Walter L. Ruckle. From a decree dismissing the bill, plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*J. Richard Standiford,* for the appellant.

*James F. Thrift,* with whom were *McIntosh & Thrift* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

Minnie M. Ruckle, the appellant, filed her bill in this case, asking for a divorce *a vinculo matrimonii*, from her husband, the appellee, upon the ground of adultery.

The bill also charges the husband with abandonment and desertion of the plaintiff in June, 1919, which, as alleged, continued to, and was existing at, the time of the filing of the bill on the 21st day of February, 1921, the time thereof being less than the statutory period of three years.

The parties to this divorce proceeding were married in December, 1891, and have, as a result of that marriage, four children, now living, two sons, aged 26 and 24 years, respectively, and two daughters, one 13 and the other 11 years of age.

For nearly thirty years the appellant and appellee lived together as man and wife, under the same roof, slept in the same bed, and ate at the same board, all of which were furnished and provided by the husband.

It was not until 1919 that any change was made in the manner of their living. At that time the husband left the bed occupied by him and wife, and slept on a couch in the dining room of their home for a period of a month or more, when, because of the broken condition of the couch, he went to another room of the house, which was thereafter continuously occupied by him alone to, and at, the time of the trial of the case below. In all other respects the parties continued to live as before, and with them lived their two sons and daughters, all of whom are unmarried.

An examination of the record will disclose that the appellant utterly failed to sustain the charge of adultery against the appellee.

The husband's custom of spending his evenings from home, to avoid, as he says, the criticisms and scoldings of his wife, with other things to which we will hereafter refer, caused the appellant to suspect him of infidelity in respect to his marital vows and obligations.

It appears from the appellant's evidence that she discovered in the appellee's unlocked desk, in the house in which they lived, a number of articles, which are at times, it is said, used in sexual intercourse to prevent pregnancy, or to avoid the contraction of venereal diseases.

The appellant when first upon the stand referred to these articles and said they, or ones like them, were in the house a number of years before, and were used by her husband in his intercourse with her, but he had long since quit using them with her, and when she recalled having seen him, before her alleged discovery, go to the desk in the evenings before going out, as she then thought, to get bills and other papers, she after such discovery suspected him of carrying them with him at such times to be used for "a bad purpose."

She said in connection therewith that on one occasion, after the discovery of the articles, and while her husband was still in the house, she saw them in the desk, and when she again went to the desk after he had left home she found they were not there. This was, however, as far as we are able to gather from her testimony, at least a year before June, 1919, when the appellee left the room occupied by him and her.

The appellee, in speaking of the articles mentioned and the use of them, said the first one he ever saw was one shown to him by his wife, that she had received from her sister-in-law. Whether this particular one was used by them is not shown by the record, but thereafter he got more of them, as he says, for use at home, and it is admitted by the wife that these were so used, and the appellant further stated that it was the only use that he had ever made of them. This was at least fifteen years before the taking of the testimony in the trial of the case below. He also said he had not had one in his possession for at least twelve or fifteen years and had never taken one from his home.

Raymond, the elder son, testified that his parents lived in much turmoil for quite a while before their troubles of June, 1919; that they would become involved in heated arguments.

caused chiefly by his mother's objections to his father staying out late at night; that she would ask him where he had been and would get no explanation from him. In these arguments, he said, "there was a great deal of cursing and swearing. My father, and of course at some times my mother, would get angry and she would answer in the same language that he used."

The appellant testified that in these arguments her husband would make admissions that he was going with other women. These admissions, he said, were untruthfully made, when angered by the false accusations and charges made against him by his wife.

The wife was asked upon cross-examination if her husband ever mentioned the name of any particular woman and she said "well he was caught out with a Mrs. Newcomer." "Who caught him out with her?" To which she replied, "Some lodge had a bazaar and he walked in with a lady and Mr. Lefluer (a friend of the appellee) walked in with a lady and this little Viola Beeler tripped up to him—she was Raymond's friend—she said 'Mr. Ruckle are you here tonight?' And the following day I was told 'I would take that man in hand. I would not leave him go out again. What business has he going out with ladies?'"

The appellee, in explanation of his alleged misconduct on the occasion mentioned, said that he knew of no woman by the name of Newcomer, but knew a Mrs. Newton, the wife of a friend of Mr. Lefluer; that he had visited the Newton home with Lefluer and had met both Mr. and Mrs. Newton. After that visit "The Orioles gave a supper and entertainment at Lehman's Hall." Leffler was at that time a member of the order and invited the appellee to attend the supper with him. He accepted the invitation and, as they entered the hall, Lefluer suggested that Mrs. Newton was at one of the tables and that they would find her and "she will give us something to eat * * *. So we went in and in going around the hall some young lady hollered 'hello, Mr. Ruckle.' I

looked around and it was this Miss Viola Beeler.  I said,
'Are you here'; she said, 'Yes, I am helping * * *.'  While I
was talking to her, Mrs. Newton spied my friend Walter
(Mr. Lefluer) and said, 'Oh, Walter, did you come at last?'
Q. Your name is Walter too?  A. Yes.  So the next thing
I heard about the instance, which meant nothing at all to
me was when I got home, it was a day or so afterwards, my
wife tells me Viola had found me up there at the hall with
another woman and that she spoke to me in very endearing
terms and immediately made a great thing out of it, but it
was nothing at all."  He further testified that he did not
recall that he was ever in her company again, unless it was
on one occasion, when he went with Lefluer to Joe Newton's,
and he might have met her on that occasion.

It was chiefly upon the facts stated that the charge of
adultery was made by the wife.  There are other facts that
were offered by the plaintiff, tending, as she thought, to sus-
tain the charge of adultery, but they are in our opinion so
trivial and unimportant that to relate them would be to pro-
long this opinion without serving any good purpose.

The matrimonial difficulties were largely caused, no doubt,
by the husband not remaining at home in the evenings with
his wife and family, and by the distrust of the wife which was
thereby created.  The reason assigned by the appellee for
not remaining at home was to escape the complaints and
scolding of his wife, that started some years after they were
married, and grew worse as years went on.  In these troubles
his wife had the sympathy of her children, who in time with-
drew from him, as he states, the deference they owed him
both as father and the head of the family.

The wife does not attempt to explain why or in what way
he first acquired the habit of leaving his home in the eve-
nings, more than to say that he would at times say that he
had to go to attend to something in connection with his busi-
ness, and his going out became more frequent and his return
to his home much later with the lapse of time.

As in many cases, it cannot be ascertained from the record who was responsible for these troubles in their incipiency, or which of them was censurable for their increased frequency and intensity. But these questions we are not called upon to decide in this case. The question for our decision is, has the appellant, by the evidence offered, sustained the charge of adultery against her husband, and this she has not done, as we have already said.

The decision of this question, however, does not dispose of the case, as we have yet to determine whether there has been any cruelty of treatment or excessivly vicious conduct on the part of the husband in respect to his wife, or an abandonment or desertion of her by him, within the meaning of the law, entitling her to a partial divorce.

Section 38 of article 16 of the Code provides that a divorce *a mensa et thoro* may be decreed for, "first, cruelty of treatment; secondly, excessively vicious conduct; thirdly, abandonment and desertion; * * * and the court may decree a divorce *a mensa et thoro* in cases where a divorce *a vinculo matrimonii* is prayed, if the causes proved be sufficient to entitle the party to the same."

There is some evidence that the appellee on several occasions, following the heated arguments above referred to, used more or less violence with his wife, but it was not, we think, sufficient to warrant us in holding that a partial divorce should have been decreed therefor, in view of the fact that such violence occurred not only long before the filing of the bill, but even prior to the time when the appellee ceased to occupy the room in which he and his wife slept; nor could his conduct, now complained of, have been very seriously considered and regarded by her or her attorneys, when it is not referred to or mentioned in her bill.

This leaves for our consideration only the charge of abandonment or desertion, based altogether upon the fact that the defendant left the room in which he and his wife slept, and thereafter slept alone in some other part of the house, while in all other respects they lived as before.

The sole question for our decision is, did such act of the husband, under the facts and circumstances disclosed by the record, amount to an abandonment and desertion under the divorce law of this State.

In *Fleegle* v. *Fleegle,* 136 Md. 630, recently decided by this Court, the bill alleged that, without just cause the wife, the defendant to the bill, refused to permit her husband, the plaintiff, to have sexual intercourse with her and refused to occupy any longer the same room with him, but arranged a room in another part of their home, and thereafter, she without just cause or any cause whatever, refused continuously to have any sexual intercourse with him. A demurrer filed to the bill was overruled by the court below, and on appeal to this Court the ruling of the lower court thereon was sustained in an opinion written by Judge Briscoe.

In that case, following other decisions of this Court, there cited, we held that abandonment, to constitute ground of divorce, must be the deliberate act of the party complained of, done with the *intent* that the marriage relations should no longer exist. And this Court, in its opinion in that case, quoted with approval from *Mr. Bishop's Work on Marriage, Divorce and Separation,* vol. 1, section 1676, where it is said: "Nothing injurious to the health can be required of either party in marriage. But if from no consideration of health, and from no other good reason, either the husband or the wife permanently, totally and irrevocably puts an end to what is lawful in marriage and unlawful in every other relation— to what distinguishes marriage from every other relation— this by the better opinion constitute matrimonial desertion."

The Court in that case also quoted from Mr. Nelson, in his treatise on *Divorce and Separation,* in which he, speaking of the policy of the ecclesiastical law, says: "Marriages were encouraged for reasons of public policy and morality. If one party was impotent, that is, incapable of sexual intercourse, the marriage was held voidable, for the other party was not to be held in an unnatural relation, repugnant to sex, injuri-

ous to health and promotive of adultery. In our age and country marriage is encouraged for the propagation of the race and the nurture and education of children in a home, as well as the prevention of licentiousness; and the State has no active interest in preserving a marriage where these ends and purposes are defeated. If the impotence of a party defeats the purpose of marriage, it must be conceded that a *wilful, continued* and *unjustifiable refusal* of sexual intercourse will do so."

And the Court, upon the facts there disclosed, concluded by saying: "It must follow that the refusal of the wife to perform her duty in this respect constitutes a desertion within the meaning of the statute, and within the reason and policy of the law."

The case before us differs from *Fleegle* v. *Fleegle,* in that the essential facts constituting abandonment are not found to exist herein.

In this case the act complained of is the alleged withdrawal by the husband of the wife's marital right to have sexual intercourse with him, or as more elegantly expressed by Mr. Bishop, the withdrawal from her by him of that which "is lawful in marriage and unlawful in every other relation." The mere fact that the husband or wife ceases to occupy the bed or room in which they have been accustomed to sleep, and thereafter occupies alone another room of the house, is not necessarily a withdrawal of said marital right from the other, for that right may continue and be exercised thereafter under the changed conditions, with the full understanding and approval of both. It is only where the one complained of leaves the other, as we have stated, and continuously refuses him or her that right, when it can be exercised without injury to the health of either, and without the existence of any reasonable or just cause for not permitting it, that such act amounts to abandonment.

The wife stated in her examination in chief that she "made repeated efforts to get him to come back," meaning thereby,

as we would ordinarily infer, that she tried to get him to again occupy the room with her; but upon cross-examination, she was asked, "Since June, 1919, you have made overtures repeatedly to Mr. Ruckle for him to return and live with you, his wife? A. I positively deny that. Q. You have not done that? A. Oh, mercy, no. Q. I understood you to say that ever since June, 1919, you made no overtures to him. A. Oh! My! Mr. Thrift, never, he asked me to enter his room, he begged me to go to his room and talk the matter over, that we could get along better." But nowhere does she say that he refused her said right or that his leaving her room was done with the intent and purpose of defeating her in the exercise of it. On the contrary she says he at one time complained with her for not doing her duty as a wife, when she was at the time ill and "unable to humor him," and the occasion referred to was after her sons had left for the war, and not so far in advance of his leaving her room in June, 1919.

The appellee when upon the stand stated that in leaving the room of his wife he had absolutely no intentions of severing his relations with her, but his object in so doing was to avoid her accusations and scolding which would last, as he says, far into the night, keeping him awake and rendering him unfit for work the next day.

The following answers of the wife further indicate her attitude as to the continuance or renewal of the marital relations with her husband. She was asked, "He did make overtures to you?" and she answered, "That one time I know he had an idea to get me in that room. I would not enter that room with him. He asked me to come up to his room, we could talk it over better. Q. How long ago was that? A. That was after Mr. Standiford filed the bill. Q. You think he had some ulterior motive in asking you to go to his room? A. I think he did, the way he spoke. Q. Do you think he wanted you to come in for some purpose that was not connected with the marital relations? A. I think it was mar-

riage relations, I positively do. Q. And you declined? A. Yes, because I thought it was not very ladylike to go in that room after he locked himself up. Q. You thought it was not ladylike to be a wife to him? A. Not after I filed the bill and had him up for adultery."

The facts of this case fail to show the essential elements of abandonment and desertion entitling the plaintiff to even a partial divorce and we will therefore affirm the decree of the lower court dismissing her bill.

*Decree affirmed, with costs.*