## LOUIS J. ROTH *vs.* IDA B. ROTH.

### *Divorce—Abandonment.*

A refusal by the wife, without just cause, to have sexual intercourse with her husband, constitutes marital desertion which, if continued, entitles the husband to a divorce.

*Decided February 1st, 1924.*

Appeal from the Circuit Court No. 2 of Baltimore City (DUKE BOND, J.).

Bill by Louis J. Roth against Ida B. Roth. From a decree for defendant, plaintiff appeals. Reversed in part.

The cause was argued before BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*Richard S. Culbreth,* for the appellant.

*David Ash,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a decree of Circuit Court No. 2 of Baltimore City, dismissing the bill of complaint of the appellant for a divorce *a vinculo matrimonii* from the appellee.

The bill, which was filed on November 1st, 1922, charges that the plaintiff and the defendant were married in October, 1893, and lived together in Baltimore City until some time in June, 1918; that they had six children living, the youngest having been born on November 9th, 1912, all of whom were being supported, maintained and educated by the plaintiff; that the defendant had frequently ordered the plaintiff "out of their house and home, and told him to get out and

stay away, that she did not want him," and "would not live
with him any longer"; that the defendant, against the
"wishes and protestations" of the plaintiff, associated her-
self and "their minor children with some of her relatives
who were living * * * immoral and improper lives" and
"were unfit and improper associates for their minor chil-
dren"; that she had "poisoned the minds of their children
against" the plaintiff, and had "incited them to acts of dis-
obedience" and "to disrespect" him, and had for many years
interfered with the exercise of his parental authority; that
for many years the defendant had, without just cause, treated
him "with excessively vicious conduct and cruelty" and did
"brutally beat and assault" him and fractured several bones
in his right hand; that notwithstanding his conduct had
always been kind, affectionate and above reproach, the de-
fendant, without just cause "willfully and deliberately aban-
doned and deserted" him, and has declared her "intention to
live with him no longer," and that such abandonment has
"continued uninterruptedly for more than three years last
past, and is deliberate and final, and the separation of the
parties is beyond any reasonable expectation of reconcilia-
tion"; that in the month of June, 1918, the defendant
refused to occupy the same bed and room with the plaintiff,
and has ever since refused to do so, and has "refused to live
with him as man and wife," to eat with him, and to speak
to him.

The defendant in her answer admits the marriage and
that she and the plaintiff have six children living, but denies
the other matters alleged in the bill, except the averment
in the seventh paragraph thereof that in the month of June,
1918, she "refused any longer to occupy the same bed or
room with" the plaintiff, as to which her answer alleges:
"The plaintiff has demeaned himself against this respondent
in such a manner that she could not with decency and self-
respect occupy the same bed or room with" him, and "that
she arranged another bed and room in another part of the
house." The answer further alleges that she brought suit

in the Circuit Court of Baltimore City, on the 8th of January, 1920, for a divorce from the plaintiff, and that from the final decree in that case she had entered an appeal, which appeal had not been disposed of, and that therefore Circuit Court No. 2 of Baltimore City was without jurisdiction in this case.

The plaintiff testified that he and the defendant and their five youngest children reside at 3009 Garrison Boulevard, and have resided there ever since 1910; that he and the defendant have not lived together as man and wife since June, 1918, at which time she left his bedroom and has refused to "cohabit" with him ever since; that prior to June, 1918, he and Mr. A. J. Simon owned a farm in Talbot County, Maryland, near Easton, which was subject to a mortgage of $4,000 and was not paying them, and they decided to sell it; that the defendant knew that the farm was not paying them, and that when he spoke to her about selling it she gave her consent, but that after he and Mr. Simon had entered into a contract to sell it in May, 1918, and he asked her to execute the deed, she refused to do so unless he gave her a large part of the proceeds of sale, which he declined to do because, in addition to the mortgage indebtedness, he was indebted to the National Bank of Baltimore to the extent of about $3,500 on a note which had become due and payable, and he needed his share of the proceeds of sale to pay the note; that Mr. Simon, by reason of the refusal of the defendant to execute a deed, was compelled to file a bill for the sale of the property for the purpose of partition, and that, after it was sold and the proceeds were distributed, she filed an exception to the auditor's account; that the reason the defendant gave him for leaving his bed was because he refused to give her a part of the proceeds of the sale of said property, and that when she left his bedroom in June, 1918, she took a room on the opposite side of the house and told him she would never live with him any more, did not want to have anything more to do with him and was through with him, and that notwithstanding he has

made repeated efforts to induce her to return to his bed, she positively declined to do so, and has occupied another room ever since; that after she left his room she repeatedly told him to get out of the house and go live with his sister or at a hotel, as she did not want him in the house at all; that the reason he knows that the separation is final, and beyond any hope or expectation of a reconciliation, is that, in addition to having said to him "over and over again" that she would not live with him or resume marital relations with him, and did not want to have anything more to do with him, the defendant had instituted two suits against him for a divorce; that the first of said suits was brought in October, 1919, and was dismissed in December, 1919, because of her failure, after he had filed his answer, to comply with the rule for further proceedings, and that after the bill was dismissed he asked her on New Year's Eve, in the presence of five of their children, to resume marital relations with him, and she positively declined to do so and, on the 8th of January, 1920, filed another bill against him for a divorce, which, after having been heard on its merits, was dismissed by the Circuit Court of Baltimore City, and its decree was affirmed by this Court in March, 1923; that on October 21st, 1919, he returned home from Oklahoma, where he had been engaged in some business, and, finding the defendant and two of his daughters out, he retired about 11 o'clock, taking his little baby, who was seven years old, to bed with him; that the defendant and his two daughters came in about half-past 1 o'clock and he opened the door for them and then went back to bed; that a short time after he returned to his bed, the defendant came into his room and attempted to take the child out of his bed; that he asked her to leave the child alone, and told her there was no reason to wake him up as he could take care of him, but that she created a scene and woke the child up and he started to cry; that she insisted that the child should go to bed with her, threatened to "take something and knock his (the plaintiff's) brains out," and finally called upstairs to the third story to his

oldest son, who was about twenty-four years old, to come take the child from him, and incited his son to assault him and compelled him, the plaintiff, to send for police protection and to order his son out of the house; that his son refused to leave the house, and the police officer refused to arrest him unless he accompanied him to the station house and preferred charges against him, but as he was his son and he did not like to see him locked up, he deposited collateral for his appearance next morning; that he, the plaintiff, appeared the next morning before the magistrate, and after asking the magistrate to talk to his son, he withdrew the charges against him; that on another occasion, on the 27th of July, 1920, when he was about to return to Oklahoma on business and was packing his grip, he looked into his bureau and around his room for some handkerchiefs and a towel or two, and finding none he went into the defendant's room to look for some, and as he was looking for some handkerchiefs in her bureau drawer she came in with some of the children and in a furious manner started to villify and abuse him, and with all the force she could she closed the bureau drawer and caught his hand in it so that he could not pull it out, and then picked up a large handmirror that was on the bureau and struck him with it repeatedly and broke four bones in his right hand; that she constantly interfered with the exercise of his parental authority over his children and threatened to shoot him a number of times. On cross-examination the plaintiff said that the defendant had on three occasions prior to 1918 refused to occupy his bed, and that in 1895 she deserted him for four years, and in October of that year filed a bill against him for a divorce *a mensa et thoro*, alimony and counsel fees, which she afterwards dismissed; that he never gave her "any cause * * * and did not know any reason" for such treatment, except that she had declared to him that she had married a man she never loved because of her mother's request, and he objected to her taking his daughters to visit her brother, who was living in

open and notorious adultery with a woman and was suffering from a loathsome disease.

Aaron J. Simon, a member of the bar, who had been occupying law offices with the plaintiff for twenty-two years, and who with the plaintiff owned the farm in Talbot County referred to, testified that, after the plaintiff told him that the defendant would not unite in the deed for the farm, he, against the advice of the plaintiff, went out to see the defendant and told her that they had sold the farm in good faith, explained the position in which she was placing the witness and asked her if she would not sign the deed; that she refused to join in the deed, and said that she would not sign it or "any other papers" for the plaintiff. that the marital affairs between them had not been as easy going as it should be and she did not see why he did not leave the house and go and live elsewhere and "leave her and the children there alone"; that the reason she refused to sign the deed was because he did not give her any money out of the proceeds of sale, and said if she got some money out of the proceeds she would sign the deed. Mrs. Hinder testified that in 1919 the defendant told her that she could not live with the plaintiff, and did not intend to be "a wife to him in any respect," and that some time later, when the witness told the defendant that she thought it was sad that she, "a mother" of six living children, should be living as she was, she replied: "I will never love that man; I will never be his wife." Officer Balderson testified to the occasion referred to by plaintiff, when he took the plaintiff's son to the station house, and the plaintiff put up collateral for his appearance next morning; and Sergeant Gray testified to the occasion referred to by the plaintiff, when he was called to the plaintiff's house and went with him to Doctor Fehsenfeld's to have his hand, which was very much swollen, attended to and bandaged.

Mrs. Dorsey, a witness for the defendant, testified that she did laundry work for the defendant at the defendant's house sometimes during the years from 1913 to 1915, and at times

she heard the plaintiff talking loud as if he was angry, and that on one occasion she saw the plaintiff with a cup in his hand, and as he was very angry, "I thought he was going to throw the cup at her." On cross-examination she said she had testified to the same effect in the divorce case of the defendant against the plaintiff. Miss Cover, who lived next door to the plaintiff and defendant, testified that she frequently heard "Mr. Roth's voice raised in anger," but that she was never in their house, and that on one occasion in the summer, when the plaintiff's youngest boy was a baby, and the plaintiff was very angry, Mrs. Roth and the children sought protection in witness's house and sat on the lawn from 7 o'clock in the evening until 12 o'clock. On cross-examination she stated that she had given the same testimony in the case of "Mrs. Roth against her husband." The defendant testified that the plaintiff was always cruel and unkind to her, and that three weeks after the death of their first child the plaintiff tried to choke her and said he was going to cut her throat with a razor; that in 1895 she left him for four years because she could not get along with him; he quarrelled all the time, and often locked the doors and would not let her out, and that after they moved to North Avenue they got along better and he was kinder to her; that from North Avenue they moved to Park Heights Avenue, and from there, about a year later, to Garrison Boulevard. When asked what the plaintiff's behavior had been since they moved to Garrison Boulevard, she replied: "Well, he has never been kind to me. He has always been cruel, * * * When he started to quarrel he would quarrel with the family a couple of hours at a time. People would stand out in the alley and listen. He struck me there. I have had to call up the officers on several occasions when he struck me there." When asked when he struck her, she said it was just before 1915, and that he struck her "a month ago with a folded newspaper." When asked to state what took place on the occasion when the plaintiff went to her bureau drawer, she said that she was washing the dishes and the

plaintiff came downstairs with some paper in his hand and threw it at her and struck her on the back; that she then went out on the porch and while she was sitting there he locked the door and went upstairs; that her daughter, Helen, came downstairs and told her something and they went upstairs and found the plaintiff in her bureau; that she told him she had some papers in the drawer that she did not want him to have and that she put her knee to the drawer and tried to shove it, and he kept pulling it and she took a hand mirror and hit him on his hand, until her son, Edward, came home and said he was going after an officer; that the plaintiff then chased her son upstairs, and her next oldest son went for the officer, and the officer came and took him out, and that before he came back she took her papers out of the drawer. In reference to leaving the plaintiff's bed, she said she had been sleeping in bed with her youngest child ever since 1912, and that the plaintiff understood that he could visit her there whenever he desired to do so, and that she "never refused," and that the statement of the plaintiff that he had made a number of efforts to have her return to his bed and that she refused to do so was not true; that when she refused to sign the deed for the farm mentioned the plaintiff told her that he did not want anything more to do with her; that the plaintiff on the New Year's Eve referred to never asked her to "resume marital relations" with him, but asked her "if we could not be friends again," and that she replied that she "thought it was too late"; that she never threatened to knock the plaintiff's brains out, or to shoot him or to do him any bodily harm; that she never told Mr. Simon that she did not see why the plaintiff could not leave her home and leave her alone, and that she never told Mrs. Hinder that she did not intend to be a wife to the plaintiff, but did say to her that if the plaintiff did not do better she was going "to try to get a separation." On cross-examination she testified that on the occasion when the plaintiff threatened to cut her throat she did not see the razor, and that on the occasion when she

said he struck her he struck her with a folded newspaper; that the only reason she left the plaintiff's bed was to sleep with the baby, and that her testimony in this case is the same as her testimony in her divorce case against the plaintiff. On redirect examination she stated that the plaintiff had never requested sexual intercourse with her since 1919, and that she had never refused to live with him as his wife. Helen Roth, a daughter twenty-two years of age, testified to the occasion when the defendant struck the plaintiff on his hand with a mirror to prevent him from opening a bureau drawer and, in reference to what occurred on the New Year's Eve referred to, she testified as follows: "We came upstairs and Edward and Lottie and I, and mother was up there and my father was there, and he asked if my mother would not be friends, or something like that, and I said that was up to my mother. * * * And mother said she thought it was too late after all these years how he had abused her and everything." She also testified that the plaintiff came home one night when he was "doped" and "grabbed my mother and choked her."

The plaintiff when called in rebuttal testified that he had never used "dope" and had never used any narcotics; that he never laid the weight of his hand on his wife in his life with the intention of assaulting her; that he had no recollection of having struck her with a newspaper, and if he ever did such a thing it was by way of a "salutation only"; that he never grabbed his wife by the throat or threatened to choke her, and that his daughter testified in the divorce case of his wife against him, but that her testimony in this case is the first time he ever heard of his having choked or threatened to choke the defendant.

The record also shows that in the case instituted in October, 1919, by the defendant against the plaintiff for a divorce *a mensa et thoro,* the second and third paragraphs of the bill were as follows:

"2. That for many years past the said Louis J. Roth, her husband, has treated your oratrix with great

cruelty, harshness and brutality, has threatened to strike and beat her, has insulted and villified her, and, for some time past, his conduct became so intolerable that your oratrix left his bed.

"3.   That he has ever since, by threat and violence and insult, prevented her from returning to said bed, refuses to treat her with the affection and respect due a wife, fails to contribute adequate means for her support and that of her said infant children, although he is a man of large means, and engaged in a lucrative profession, that enjoys or ought to enjoy an income of not less than five thousand dollars a year."

The record also shows that in the second suit for a divorce instituted by the defendant on the 8th of January, 1920, the allegations of the bill were the same as in the earlier case.

In the cases of *Fleegle* v. *Fleegle,* 136 Md. 631, and *Martin* v. *Martin,* 141 Md. 182, this Court held that "a refusal by the wife, without just cause, to have sexual intercourse with the husband constitutes marital desertion, and if continued would entitle the husband to a divorce," and in the case of *Ruckle* v. *Ruckle,* 141 Md. 207, the Court, speaking through JUDGE PATTISON, said: "In this case the act complained of is the alleged withdrawal by the husband of the wife's marital right to have sexual intercourse with him, or, as more elegantly expressed by *Mr. Bishop,* the withdrawal from her by him of that which 'is lawful in marriage and unlawful in every other relation.' The mere fact that the husband or wife ceases to occupy the bed or room in which they have been accustomed to sleep, and thereafter occupies alone another room in the house, is not necessarily a withdrawal of said marital right from the other, for that right may continue and be exercised thereafter under the changed conditions, with the full understanding and approval of both. It is only where the one complained of leaves the other, as we have stated, and continuously refuses him or her that right, when it can be exercised without injury to the health of either, and without the existence of

any reasonable or just cause for not permitting it, that such act amounts to abandonment."

In the case at bar the plaintiff states that the defendant left his room in June, 1918, because he refused to give her a part of the proceeds of the sale of the farm in Talbot County, declared that she would never live with him any more or have anything more to do with him, and has refused to live with him or to "cohabit with him" ever since. His testimony is not only corroborated by Mr. Simon, to whom she said that she wanted the plaintiff "to get out and live elsewhere and leave her alone"; by Mrs. Hinder, to whom she declared that she would "never be his (plaintiff's) wife"; by his daughter, Helen, who stated that when the plaintiff asked the defendant in 1919 if they could not be friends again, she replied that it "was too late," but also by the admission of the defendant that she said to him on the occasion mentioned by the daughter that it was "too late" for them to resume friendly relations. In her testimony the defendant denies that she left the plaintiff's bed in 1918, and says that she left his room in 1912 and has been sleeping in another room ever since in order to be with her youngest child, and that it was understood that the plaintiff could "visit there whenever he got good and ready," but this testimony is not supported by the other evidence in the case and is inconsistent with her answer in this case and the bills filed in her two cases for a divorce, in which she alleged that she was compelled to leave his bed because of his demeanor, and brutal, cruel, and insulting conduct towards her.

The testimony of the defendant that the plaintiff started to choke her and to cut her throat with a razor early in their married life, and the statement of the daughter, Helen, that the plaintiff choked the defendant, are wholly uncorroborated, and are positively denied by the plaintiff, and such acts of misconduct on the part of the plaintiff as are supported by satisfactory evidence, while very reprehensible, are not sufficient to justify desertion or abandonment by the

defendant. In the case of *Buckner* v. *Buckner,* 118 Md. 112, JUDGE URNER said: "This Court has consistently held that the law will not countenance the living apart of the husband and wife except for grave and weighty causes"; and in *Taylor* v. *Taylor,* 108 Md. 134, this Court said: "To justify the living apart of a married couple the causes must be grave and weighty and such as to render the performance of marital duties impossible."

The suggestion in the answer that the court below was without jurisdiction in this case because of the pendency of the wife's appeal in her case against the defendant was not urged in this Court, nor does it appear how the jurisdiction of the court below was affected by said appeal, which was disposed of by this Court in March, 1923.

The decree of the court below, in addition to dismissing the bill, required the plaintiff to pay the defendant a counsel fee of seventy-five dollars and the costs in the case. As the evidence in the case sustains the essential averments of the bill, the plaintiff was entitled to the relief prayed, and that part of the **decree which dismissed** his bill must, therefore, be reversed and cause remanded, in order that a decree may be passed in accordance with the opinion of this Court.

> *Decree affirmed in part and reversed in part, and cause remanded in order that a decree may be passed in accordance with the opinion of this Court, the costs in this Court and the court below to be paid by the appellant.*