## EDGAR T. BEACH *v.* LETHA L. BEACH.
[No. 30, October Term, 1930.]

*Decided December 4th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*G. Franklin Onion* and *J. Britain Winter* for the appellant.

*Helen Elizabeth Brown,* with whom were *Ingram & Brown* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

In this case the appellant, Edgar T. Beach, filed his bill against his wife, Letha L. Beach, the appellee, alleging therein, that on or about the 8th day of July, 1922, she, without just cause or reason, abandoned and deserted him, and that such abandonment and desertion had continued uninterruptedly for more than three years and asked that he be granted an absolute divorce from his wife. In her answer to the bill, she denied the allegation of abandonment and desertion charged against her, and averred therein that the appellant had not only treated her with great cruelty and brutality, but had on the 16th day of June, 1922, without cause or reason, abandoned and deserted her. She thereafter filed a cross-bill alleging her husband's abandonment and desertion of her and asking that she be granted alimony and counsel fee.

The court heard evidence upon the bill and cross bill and the respective answers thereto, and passed its decree dismissing both the bill and cross-bill, from which decree the husband has appealed.

The appellant and appellee, who were married in 1894, have had born to them eight children, seven of whom were living at the time of the trial of this case, and all of full age, with the exception of Charles, who reached manhood in August, 1930.

The record discloses that the husband and wife, throughout their entire married life, often had their quarrels, and the husband on two occasions, prior to the final separation, had left the home in which they lived, but returned after

being separated only a short while. The domestic difficulties between them, as stated by the husband, arose chiefly from the alleged fact that the wife failed to pay, out of the money given to her which was earned by him, debts that had been incurred by them, though the further complaint was made by him that, in the months immediately preceding the final separation, she refused to permit him to have conjugal relations with her and required him, as he stated, to obtain from a physician a certificate to the effect that he was free from venereal disease, and was in a condition in which it was safe for her to have such relations with him, and, though he obtained the certificate, such marital rights were still withheld from him by her.

It may be gathered from the evidence that many of the quarrels between them were the result of the financial difficulties mentioned, though it is disclaimed by the wife that they were the chief cause of their troubles.

The final separation followed a quarrel between the parties in June or July, 1922, when, as stated by the husband, he was told by his wife "to get out, the sooner I got out the better. It would be the happiest day in her life if I went out and closed the door behind me and never open it again. * * * I want to be a free woman. I want to be free of everything. I said, all right." It was, as stated by the appellant, because of these commands of the wife that he left the home and went to his daughter's, with whom he lived until the institution of these proceedings, when he was informed by her that she did not wish him to remain longer with her. While at his daughter's, a period of over seven years, he contributed nothing to the support of his wife, although, in the year 1929, he received from the Baltimore Museum of Art in Wyman Park a salary of thirty-five dollars a week, which with compensation for over-time, amounted to $2,325.00, or an average of forty-four dollars and fifteen cents per week, and in addition to this he received a pension of seventy-five dollars a month from the Fire Department of the City.

It is contended by the appellant that, though he left the marital home, it was not an abandonment or desertion of his

wife by him, but an abandonment or desertion of him by her, because of her commands and directions to him and the circumstances under which he left that home. In support of this claim, Thomas E. Beach, his son, was offered by him as a witness, who testified that, upon a visit to his mother, a few days after the separation, he was told by her that his father had left after an argument between him and her, and after being told by her "to get out". The son Charles, who at the time of the separation of his parents was not more than twelve or fourteen years of age, testified that he did not remember the time of their separation or. what was said by them at that time. Thereafter both of the attorneys for the appellant testified that they called upon Charles. prior to the trial and asked him about his being present at the time of the separation, and what was said by his mother or father at that time, and they were told by him that he was present and heard his mother say to his father, "to get out and stay out," etc., but, when told that he would be summoned to testify in the case, he said he would not tell anything. The evidence of Charles cannot be regarded as giving any support to the alleged statement of his father that he was told by his mother to "get out and stay out."

As to the charge that his wife would not permit him to have conjugal relations with her, the appellant testified that he did not regularly up to the time he separated live with the appellee as man and wife. For possibly six months before the separation he slept with his son Edgar. This was because his wife had said that there was something wrong with him and she could not sleep with him. In response to her demands and to convince her she was wrong, he obtained the certificate from the doctor, showing that he was not suffering from any disease of the character heretofore mentioned. This he showed to her, but she still refused to accord to him his marital rights and to live with him as man and wife.

Edgar, when called to the stand by his father, testified that his father slept with him for some months before the final separation, his mother occupying another room of the home. He was told by his father why he did not sleep with his

mother, and was also told of the certificate. He was not clear in his recollection whether his father slept with him to the time of the separation, though he was of the impression that he did. There was no other evidence offered by the appellant in support of this charge against the appellee.

The appellee, Mrs. Beach, testified that during their married life they had their disputes and quarrels, but these were not caused chiefly by her failure to pay the bills contracted by them, which, as she said, was not due to any fault of hers, as she could not pay bills when she did not have enough money with which to pay them, as was often the case. That her husband generally incurred the indebtedness and, when the money was turned over to her by him, she applied it, as far as it would go, to the payment of such debts. That so far as she could recall, only once did she have charged to their account any article of merchandise, and that was a coat for which she was to pay eighty dollars, and upon which a small payment was made. The coat was thereafter put in storage at a cost of five dollars, which she was never able to pay, for at the time it became payable there was money owing for hospital expenses resulting from an injury received by her husband while in the Fire Department and the money they had was applied to the payment of those expenses, and the coat was lost to her. Their domestic troubles, as she testified, often resulted from his attention to other women. He would come home and tell of his affairs with them, and she would become provoked and angry with him and there would be little intercourse between them for days, or "until the grouchiness wore away." The appellee further testified that the husband left their home on the 16th day of June, 1922. When asked what happened just prior to his leaving, she said: "He was staying out nights, and then he promised to take me to the theatre, Maryland, and when the time came to go he dressed up and went alone, and when he returned I asked him where he had been, and he said the Maryland, and I was much offended at it, and I told him he had promised to take me, and a few days afterwards he said he intended to leave, and packed up his belongings and left." That when he

failed to take her to the theatre with him, she was cross, and of course her relations with him were at the time strained.

"Q. Did he say anything when he left? A. Not that I can recollect. Q. Was any one else there when he left? A. Rose, my daughter, was there. The only one I can remember being present was Rose. Q. Have you made any attempt to persuade him to come back since he left? A. No, I went to my son's house on three different occasions, and he always went out the back way, and I never came face to face. He would always leave if he saw me coming." She also testified that at times his treatment of her was harsh and cruel. On one occasion, when they were at church, he said to her: "Don't you shake hands with anybody in church." Shortly thereafter a deacon of the church came up and extended his hand, and she shook hands with him, whereupon her husband then and there slapped her in the face. Another time he threw a glass at her, and still another time, when they were in another one of their "arguments," she tried to get out of the room, and he twisted her arm in the door. As to the charge that she would not permit him to have conjugal relations with her, she testified that her refusal was because of his association with other women. When asked if she had any knowledge that he had been out with other women, she answered "yes," and when asked how she knew it, she replied: "He told me so himself." It was because of these confessions that she required him to obtain the certificate mentioned, and when it was shown to her, they thereafter lived together as man and wife until he left, which, as she thought, covered a period of possibly two months.

Rose E. Richter, a daughter, testified that she was at the home of her mother on the occasion her father left. Her mother told her he was going to leave. "He looked angry and I did not say anything, and he didn't say anything to me. He packed his things and walked out of the house, he never said good bye." She also testified that she saw him throw a glass at her mother.

Dorothy R. Rauchhous, the youngest daughter, testified that she lived with her father and mother and, up to ten

days or two weeks prior to her father's leaving home, her married sister lived at the house, and while she and her husband were there, the witness slept in the room occupied by her mother and father, and she knows that at such time they occupied the same room. After her sister's departure from the home, she moved to the third floor. After that time, she could not say whether they continued to occupy the same room.

The appellant based his charge of abandonment and desertion by the wife, first, upon her alleged refusal to have sexual intercourse with him; and, second, upon the alleged fact that he was ordered by her to leave the home occupied by them.

This court has held in a number of cases that where either the husband or wife, without justification, refuses to have sexual intercourse with the other, with the intent that the marital relations shall no longer exist, the one denying the other such right may be said to have abandoned and deserted the one denied that right. *Fleegle v. Fleegle,* 136 Md. 630; *Martin v. Martin,* 141 Md. 182; *Klein v. Klein,* 146 Md. 27. But, while this is the law of this state, the appellant has failed in his efforts to establish the truth of the charge so made against his wife. The only evidence tending to corroborate the evidence of the appellant as to such charge is that of his son Edgar, which went only to the extent of saying that his father slept with him for some months before the separation, while his mother at that time occupied another room in the house, but he could not say with any degree of certainty that he continued to sleep with his father until the separation. The fact that the appellant slept with the witness, as stated by the latter, is not conclusive of the fact that the appellee refused to permit the appellant at other times and places to have those relations with her. *Ruckle v. Ruckle,* 141 Md. 207.

The wife testified that at the time of the separation she and the appellant were living together as man and wife. She admitted that she, for a short time only, refused to have sexual intercourse with him, and this was because of her fear of injury to herself if she permitted such intercourse; but when

her apprehensions were allayed by the production of the above mentioned certificate, the suspended marital relations were resumed and these relations were continued to the time he left. In addition to this, their daughter Dorothy testified that she, up to within two weeks of the time of their separation, slept in the room occupied by her mother and father. Thereafter she slept in a room on the third floor, which had been vacated by her married sister. She knew nothing of her father sleeping with Edgar. The only room she knew him to occupy was the one in which he slept with her mother. It is thus clearly shown that the appellant failed to sustain this charge brought against his wife.

The evidence produced in support of the second charge, that he was ordered by the wife to leave the home, also fails to establish such fact. The only corroborative evidence offered to sustain that charge is that of the son Thomas, who said that, on a visit to his mother's some days after his father had left, he was told by her that his father had left the home after being told by her to "get out." Without passing upon the question whether this order of the wife, if given by her, was under the facts and circumstances sufficient to constitute a desertion and abandonment of him by her, the evidence offered was not sufficient to establish the fact that she ordered him to leave the home, certainly not in the face of the express denial of the mother that she said to her son that she had told his father to "get out," and the evidence of the daughter Rose, who was at the home when her father left.

The learned chancellor, we think, committed no error in dismissing the bill. The wife did not appeal from that part of the decree dismissing the cross-bill; therefore we are not called upon to review the court's action in dismissing it.

From what we have said, the decree appealed from will be affirmed.

*Decree affirmed, with costs.*