# SOPHIA WYSOCKI *v.* CASIMER WYSOCKI
### [No. 47, January Term, 1945.]

*Decided June 14, 1945.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, HENDERSON, and MARKELL, JJ.

*Charles H. Dorn,* with whom were *Hofferbert, Dorn & Hudnet* on the brief, for the appellant.

*Marion A. Figinski* for the appellee.

MELVIN, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court of Baltimore City dismissing the bill of complaint of the appellant against the appellee for a divorce *a vinculo matrimonii* on the ground of abandonment. In addition to the formal allegations usually found in the bill in such cases, it is alleged that although the parties have been living in the same home, "the defendant has refused since the date of the separation" (May 26, 1941) "to live with your oratrix as husband and wife." In his answer to this bill the husband (appellee), in denying that he has abandoned and deserted his wife (appellant), alleges that, "on the contrary, the living apart at this time in the same house is no fault of his but is due to the wife who refuses to live with him and do for him as a wife in the home, but constantly had nagged him and accused him of improper conduct without just cause or reason."

The appellant's definition of the issue created by the bill and answer, and the one upon which her counsel based his argument on this appeal, is thus stated in his brief: "Did the appellee, without just cause or reason, abandon the appellant by not cohabiting and by stopping sexual relations with her?"

The record shows that these parties were married June 8, 1924; that they have been residing in Baltimore City ever since; that they have three children, namely, Adele, nineteen, Alfred, seventeen, and Eugene, thirteen; that the family occupies the three-story building No. 2217 East Pratt Street, owned by the parents as tenants by the entireties; that this building has three rooms in the basement and five rooms and bath on the third floor, in addition to the second floor which had been occupied as sleeping quarters by the parties to this suit; that on or about May 26, 1941, the appellee left the marital bedroom for the reason hereinafter mentioned and thereafter slept in the basement; that for the past year he has not spoken to his wife or daughter, and has not partaken of any meals in the house; that most of the house is, and has been for several years, "rented out to roomers"; that this was the wife's (appellant's) plan, and that she collects and retains all the rent from it, amounting to $42 per week; that the parties had formerly owned, as tenants by the entireties, another property (on Dillon Street) which the appellant, without the appellee's knowledge, contracted to sell; that the only time he knew the sale was going through was when he was called on to sign the deed, which he did, and for which he was paid one-half of the purchase price; that he is, and has been for the past fifteen years, organist at St. Stanislaus Catholic Church in Baltimore City, from which position his earnings amount to about $150 a month; that of this amount he gave his wife, first $80 a month, and then after the institution of this suit $60 a month; that in addition to the rent and this payment from her husband the appellant also receives the daughter's wages of $23 a week, from which total amounts the appellant pays the fixed charges and the operating expenses of the home and property.

While the prayers of the bill of complaint include those for alimony and for maintenance and support of the minor son, Eugene, no order of court was passed thereon

and this aspect of the case was not discussed on appeal. The appellant bases her whole case on the issue above referred to, namely, that the appellee abandoned her "by not cohabiting and by stopping sexual relations with her."

The law is well settled in Maryland that if the complainant's own conduct toward her husband was always "kind, affectionate and above reproach," as she alleges, and that the latter, for the period of time mentioned in the bill, without just cause or reason, refused sexual intercourse with her, then unquestionably his conduct would have to be regarded as an abandonment of his wife and, in view of its duration, she would be entitled to an absolute divorce. *Owings v. Owings,* 148 Md. 124, 128 A. 748; *Ruckle v. Ruckle,* 141 Md. 207, 118 A. 472; *Roth v. Roth,* 143 Md. 142, 122 A. 34; *Klein v. Klein,* 146 Md. 27, 125 A. 728; *Fleegle v. Fleegle,* 136 Md. 630, 631, 110 A. 889; *Miller v. Miller,* 153 Md. 213, 138 A. 20, 22; *Crumlick v. Crumlick,* 164 Md. 381, 165 A. 189; *Fries v. Fries,* 166 Md. 604, 608, 171 A. 703; *Dotterweich v. Dotterweich,* 174 Md. 697, 200 A. 523.

It is equally well settled that the mere fact that the husband or wife ceases to occupy the bed or room in which they have been accustomed to sleep and thereafter occupies alone another room in the house, is not necessarily a withdrawal of the marital right from the other. The determining factor is the continuous refusal, without just cause or reason, to fulfill the marital obligation, and the burden is upon the plaintiff to prove such refusal. *Owings v. Owings, supra; Ruckle v. Ruckle, supra.*

In undertaking to meet this burden of proof in the instant case the appellant, in her testimony in chief, does not even mention the subject of marital intercourse, but attributes her husband's action in leaving their bedroom in May, 1941, to his complaint about the disorderly condition of the room. When asked by the chancellor to state the "cause of the separation," her reply was: "I

was putting a partition in upstairs and he said he isn't going to sleep in a damned dirty room. I was willing to fix it up nicely for that night, and he moved downstairs and kept staying downstairs, and I wasn't going to beg him to come upstairs." She supplemented this by stating, in reply to the Court's further question, "Is that the only reason you two separated?": "He is very stubborn and before that, many times, sometimes he would sleep downstairs and I would go downstairs and say 'Come on upstairs, the children are big and I feel cheap, come on up'." Continuing the testimony along this line:

The Court: "Just a moment. Tell us about this time you are complaining of."

The Witness: "I would make him come upstairs. Well, this time I thought to myself, I won't beg him all the time, I feel like a lowbrow, I won't go after him and make him come upstairs if he don't want to of his own free will."

By Mr. Dorn: "Q. Have you had any arguments between the two of you? A. At that time I don't think we had any argument.

"Q. You mean at the very time that he went downstairs? A. No, he just went downstairs of his own free will. He wanted to sleep downstairs."

On cross-examination the appellant testified that: "In the afternoon he (appellee) sleeps upstairs in my bedroom on the second floor and at night, two or three o'clock in the morning, he sleeps in the basement. I never told him to sleep in the basement." Still further, on cross-examination, her only reference to the general subject of marital intercourse was made. That was brought out distinctly against her interest, for it affords definite corroboration of the testimony later given by her husband on the vital and controlling issue in this case, namely, whether the cessation of marital intercourse was due to refusal on his part, as she contends, or to her own objection to it because of fear of acquiring a venereal disease, as he contends. After admitting that

she had accused her husband of "going with other women," she further testified:

"(By Mr. Figinski) Q. Isn't it true, Mrs., you went to a doctor and accused your husband of giving you a venereal disease? A. Yes, I am always nervous.

"Q. You told the doctor he gave you a disease? A. I was afraid to get a disease, that's what I said."

It is relevant to note here that there is not a scintilla of evidence to show any adulterous conduct on the part of the appellee or that he was, in fact, diseased in any way.

That is all the testimony there is in the record on behalf of the appellant on the subject of marital intercourse, the refusal of which by the appellee is given as the specification of the charge of abandonment against him. The only other witnesses produced by the appellant were her daughter and one of the roomers in the house. The daughter's testimony had reference to the occasion when her father, the appellee, came down to the basement from the parental bedroom on the night of May 26, 1941, and announced in a sally of temper that he wasn't going to sleep up there any more. Although she said he made substantially the same statement the following night and "has slept in the kitchen ever since," the daughter's testimony has no bearing on the cause of the separation or of its continuance. It cannot be held to have any probative value as corroboration of the appellant on the issue she has raised.

Turning to his own testimony on this subject we find a flat denial of the charge of abandonment and the counter-charge against the appellant of causing and continuing the separation. The record shows the following on this point:

"Q. Now your wife accuses you in her separate suit that you have refused to live with her as husband and wife since May, 1941, tell us about that. A. No, it wasn't so. Your Honor,—it was every night when I would go to bed, she would argue and argue and accuse me of run-

ning around with different women and disease. She say, I am afraid to catch disease, and she would leave the room and go somewhere else to sleep. So that was going on for a number of nights and I just went downstairs and I just left her and went back now and then to her bedroom to take a nap in the afternoon, but she would never go in there because she always accused me of being diseased."

The fact of these recurring visits to this bedroom is fully confirmed by both the wife and the daughter, and their testimony on this point has the effect of negativing, rather than of supporting, the essential element of the appellee's intention to permanently abandon the marital relation. In order to constitute legal desertion it is incumbent upon the plaintiff (appellant) to prove not only the actual separation but also this intention, for the two elements must coincide in point of time, although they need not begin together. *Crumlick v. Crumlick, supra; Muller v. Muller*, 125 Md. 72, 93 A. 404; *Boyd v. Boyd*, 177 Md. 687, 11 A. 2d 461; *Dunnigan v. Dunnigan*, 182 Md. 47, 31 A. 2d 634.

In this state of the record there is presented a case which comes directly and expressly within the ruling of this Court in *Owings v. Owings, supra,* where the charge was, as in the instant case, that one of the parties unjustifiably refused for more than the statutory period to permit sexual intercourse, and that this constituted an abandonment entitling the other party to an absolute divorce. In sustaining the chancellor's decree dismissing the bill, this Court, through Judge Urner, said [148 Md. 124, 128 A. 749]: "The burden was on the appellant to prove his charge that the appellee *refused* to fulfill her marital obligation. (The word "refused" was italicized in the opinion.) Upon that issue we have the appellant's assertion and the appellee's denial. The admitted fact that they were occupying separate bedrooms does not substantiate the charge that intercourse was refused. *Roth v. Roth* [*supra*]; *Ruckle v. Ruckle, supra.*

The statement of the appellant to that effect required corroboration. Code, Art. 35, Sec. 4; *Dicus v. Dicus,* 131 Md. 87, 101 A. 697." In the instant case we have precisely that situation—the appellant's assertion and the appellee's denial of conduct amounting to abandonment within the definition above noted. In the record before us there is obviously no corroboration, and for that reason alone the bill of complaint should have been dismissed, as decreed by the chancellor.

This conclusion is further strengthened by the application of the maxim *"Volenti non fit injuria"* to the facts of this case, for the appellant, while complaining that she is the injured party because of the discontinuance of marital intercourse, is admittedly a willing party to the discontinuance. She has professed fear that sexual relations with her husband would give her a venereal disease—she even went so far as to consult her doctor about it—and yet has based this suit in equity upon her husband's alleged refusal to perform the act of which she says she is afraid. She thus brings herself within the scope of this maxim that a person who is willingly injured is not injured, as a matter of law. *Smith v. Smith,* 55 N. J. Eq. 222, 229, 37 A. 49; *Kruse v. Kruse,* 179 Md. 657, 661, 22 A. 2d 475.

In passing upon this appeal we deem it in order to point out that the conduct of the appellee, as well as that of the appellant, in this domestic relationship is not above censure by a court of equity under the facts here presented. It is apparent that his attitude was not only uncompromising but was reprehensible in that it showed an utter lack of appreciation of the duties and obligations of a husband and father. For over a year before this suit was brought he did not even speak to his wife and daughter, although a member of the same household, and obstinately refused to partake of a meal with them although it was regularly there for him. He owes them, at least, tolerance and patience and an effort to adjust the differences which have caused his family so

much distress. If the atmosphere of the home had become obnoxious to him, he has himself to blame in large measure for that condition, for he has apparently done nothing whatever to attempt to alleviate it. The appellant, likewise, has been unyielding in her attitude, and has made no real effort toward a reconciliation. The law expects and requires this of the parties, for where a husband and wife are living apart without fault for the separation being chargeable to either, or without legal ground for separation, each is under a duty to make reasonable efforts to effect a reconciliation, and neither can charge the other with desertion unless he or she has earnestly and in good faith made such an effort. *Dearholt v. Dearholt*, 178 Md. 405, 408, 13 A. 2d. 538.

The relief which both of these parties need, and which is obtainable if really desired, is not of the kind afforded by a court of equity or any other tribunal, but by a conscientious reconsideration of their marital vows and the determination to preserve the integrity of their home and of their family relationship. They have everything to gain by such a course and everything to lose by not following it. They have been married for twenty-one years, and during that time have acquired a home of their own and have reared three children—two of whom are still with them. The State, too, has a direct and vital interest in the outcome of a case such as this, for it has long been the policy in Maryland to recognize the integrity of the homes of its citizens as a bulwark of society, and the courts have been jealous to protect this interest. *Levering v. Levering*, 16 Md. 213; *Gellar v. Gellar*, 159 Md. 236, 150 A. 717; *Crumlick v. Crumlick, supra*.

The language of the Court in the Crumlick case is particularly appropriate here [164 Md. 381, 165 A. 190]: "The policy of this state, as indicated by its statutes and the decisions of this court, is based upon the firm belief that the interests of its citizens, collectively and individually, are best subserved by maintaining the home as the most advantageous environment under which

future citizens may be reared; to prevent the disintegration of that home and the separation of the marital parties for trivial or inconsequential reasons, and to compel that no divorce be granted except for serious and weighty causes firmly established and understood."

In the case at bar, the cause of the separation of these parties, even according to their own respective versions of it, is neither grave nor weighty and is not such as is recognized in this State as a ground for divorce. The Chancellor was correct in dismissing the bill of complaint.

*Decree affirmed, costs to be paid by appellee.*