HELEN ANTRIM *v.* WILLIAM L. ANTRIM, JR.
[No. 31, October Term, 1935.]

*Decided December 4th, 1935.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*E. Paul Mason,* for the appellant.

*Joseph T. Brennan,* with whom was *Hilary W. Gans* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

On the 12th of March, 1935, a decree by the Circuit Court of Baltimore City was passed, granting a devorce *a mensa et thoro* to William L. Antrim, Jr., plaintiff, from Helen Antrim, defendant, on the ground of desertion. The appeal of the wife was taken on the ground that the evidence did not justify the decree.

The spouses are young. They were married on February 6th, 1932, and separated on July 6th, 1934. They have no children. The bill of complaint was filed on January 15th, 1935. The wife left her husband and returned to the home of her foster parents, Mortimer West and his wife. He contends that she had no cause, and she asserts it was because of his harsh and brutal treatment and of his failure to support her.

At the time of the wedding, the husband, who is a musician, was an orchestra leader, but did not have sufficient means to provide a home for his wife. The couple went to live at the home of Mortimer West, in Baltimore,

and, except for an interval of about two weeks, remained there, almost wholly supported by the wife's parents, until March, 1934, when the wife left to visit relatives in Richmond. She and her husband were desirous of having their own home, and she informed her husband that she would come when he had obtained an apartment. He borrowed money for the rent from his wife's father, and leased an apartment, and his wife returned and they began housekeeping in March. When he rented the apartment, he was unemployed, but later became a service attendant in a gasoline station, in two weeks an interior decorator, and, in a month's time, an employee of a department store, where he is at work. In addition, he had employment at night as a leader of an orchestra. His wife, also, obtained employment in a department store across the street from where her husband had his position.

The husband's testimony is that differences of opinion arose between himself and his wife over her being at work in a competitive store, and being absent during the time when telephone calls would be made to engage his services at night as a musician. He furthermore testified that she believed that she should have the right to go out in the evenings when he was away to fill his engagements on Saturday night as a musician, and that he did not object at first, as he usually returned about half past one in the morning and would find his wife at home. After three weeks she came in after two o'clock, and then three o'clock, and then one morning she came home with some friends at a quarter to four and was rather intoxicated. The next morning the husband remonstrated with her for coming in so late, but told her that he did not object to her returning at a normal hour. These differences, according to the husband, caused her to leave.

His cross-examination, however, developed that the immediate cause of the wife's departure grew out of an invitation to the couple to dine at the home of the wife's father. The husband had accepted the invitation, but when he went for his wife in his automobile, he informed

her that he was not feeling well, and that she would have to go alone, and that he would take her and later call for her. The wife said she would not go, but would return to their home and get the dinner. She did this, and the husband resented her cooking an ample meal when he was not well enough to eat it. He attributed her action to spite, and she thought he was selfish in not going to dine after her mother had prepared the meal. These differences resulted in the wife packing her things and leaving her home at about half past eight in the evening. The husband stated that he requested her not to go, but, when she insisted on going, he drove her to her father's home.

In his examination, the husband denied that he had been cruel to his wife or that he had ever been guilty of any act of violence. The husband is not corroborated in his narrative of the quarrel on the night of the separation, nor in his assertion that his marital conduct had been free of violence. The wife contradicts him in material details of their quarrel at the apartment. He and she were the only persons present on this occasion, and, so, both are without other witnesses to substantiate their respective versions of what happened. The wife, however, does have corroboration of an act of violence of her husband both before and after their separation.

The testimony of the wife with respect to their married life before they parted is better stated at this point. It is to the effect that for two years after their wedding, with the exception of about two weeks, she and her husband lived as guests at her parents' home. During this period, her husband was unable to provide his wife with a home or to support her. Their dependent position made the wife dissatisfied, and when she returned from her visit to Richmond to occupy the apartment which he had rented with money borrowed from her father, the wife took a position and the husband obtained one, and they lived together in an unhappy state.

The wife charges that the husband was petulant, quarrelsome, and threatening. While at the home of her par-

ents, during a quarrel, at an early stage of their married life, the husband picked the wife up and threw her a short distance across a narrow room against a cupboard. She is corroborated in this charge by her mother, who, in an adjoining room, heard the noise of the impact of her body with the cupboard. Their differences and conduct were not sufficient to cause her to sever her marital relations, until their quarrel in the apartment over the invitation to dine at the home of the parents. The wife's account is of an angry scene, whose climax was an advance by the husband upon the wife with a threat to wring her neck. The wife defied him, and he came close, but did not touch her. After this episode, she began to gather her clothes. He assisted her and took her home. Before she got into the automobile, she stated he said: "Now, you know if you leave this house, you are not going to get back here again," and her reply was: "If I leave this house I won't want to come back again, I have had just about all I can take."

At this stage there does not appear any substantial foundation at law for their separation. A spirit of conciliation on the part of the husband accompanied by a firm and reasonable assertion of his marital authority might have induced the wife to abandon her purpose to leave, because she drew, from his actions, the conclusion that he was pleased to get rid of her, as he had told her to go ahead when she started to pack her clothes and had started to put them in, saying she had forgotten them; and because, on their way, the husband had stopped the automobile, and had inquired if the wife had changed her mind and her reply was that she had not, that he had let her out of the house, and that she was going to continue.

The wife's testimony of her husband's actions was not sufficient to justify her departure with the resolution to end the cohabitation. *Singewald v. Singewald* 165 Md. 136, 147, 166 A. 441. On the other hand, what she said and did in their quarrel was in anger and in haste, and, therefore, it would be unreasonable to take her actions

and declarations when done and made under such circumstances as sufficient evidence of a desertion, unless there would be further testimony that she had resolved to end the cohabitation, without the consent of the husband. The additional testimony on the part of the husband is that the wife continued to live at her father's home, without the resumption of the marital relation, although he maintained the apartment until the following Thanksgiving, and endeavored to get her to return, but that she declined, and stated to him that the breach was final, because she did not believe they could get along together, and that it would be better for them to remain apart.

In the early part of July, the husband invoked the aid of the mother, who saw his sister and arranged for a visit of the wife to the sister for the purpose of effecting a reconciliation. He, also, wrote two letters to his wife. In the first, a short note, he sent her fifteen dollars. He produced the second, whose envelope was postmarked July 18th. After this letter, which was affectionate in tenor, and expressed the sentiment that "I don't ever expect to stop trying until you and I are together and happy," the husband's wife and sister met, and, after the visit in New Jersey, the sister wrote on July 30th to her brother. She testified in the case and said that she could not induce the wife to promise to return to her husband. It was after the receipt of the sister's letter that the husband wrote a last letter, whose envelope was postmarked September 9th, 1934. He offered it in evidence. The letter is quite long and its substance is to place the responsibility for the continued separation on the wife; to submit a *modus vivendi* which, without a resumption of cohabitation or resuming their marital relation, contemplated an association in social enjoyment to ascertain whether or not they should desire to resume their relations, and "then after a reasonable time, if we don't feel any different its time to take whatever steps are necessary to part us forever."

The wife wrote no reply, although one was requested,

but soon called her husband by telephone and, according to his account, stated that she was going to leave town, and inquired if he would give her a divorce. His reply was that he did not wish a divorce, and, with a view to their reconciliation, suggested that he call for her at the store in the afternoon in his automobile and take her to dine so that they could have a talk. They met and, while he was driving out of town on the Reisterstown Road, another quarrel occurred. Antrim's version is that his wife inquired if he would give her a divorce, and his reply was that he did not know how she could then get a divorce, but that they could discuss the matter at dinner. His wife declined to go any further because she had to go back to keep an engagement. Antrim was provoked by this information, turned the car around, and took her to her father's home where they met Mrs. West. Antrim testified that he told Mrs. West that he was convinced there would be no reconciliation, and said that he was perfectly willing to do anything they wanted to do. He continued in these words: "She wants a divorce and I cannot do anything else about it. I don't want it," and Helen says, "I want the divorce and I will give you all the grounds that are necessary," and I said, "You can stand on your head and I won't divorce you."

The wife's testimony is in conflict in material particulars with reference to this ride in an automobile. Her evidence is that ten days after their separation, he called on her and expressed his regret for what had occurred and admitted that he had been at fault, and stated "there was only one way that he could make up for what he did to me, and that would be to give me my divorce and not cause me any trouble," She further testified that this was the first mention of the subject, and that it was begun by him, and, so, after she got the third letter, of September 9th, she called her husband for the purpose of talking over the proceedings for the divorce. The parties are in practical agreement about what happened before they drove out to the Reisterstown Road. The differences in their testimony begin with the wife's inquiry where

she was being taken, as they were to dine in the city. Antrim's reply was: "He was taking me nearer to the G. d. divorce, or he would take me off that road and drive us all to hell." She asked him to turn back, and he refused; and she tried to turn the automobile back, and then he threw her across the car against where it opened and then threw her back to the steering wheel, and bounced her back and forth so that she had bruises all over her legs. Before this occurred, he had been asking her to return to him. They did not get their dinner, and, when they arrived, Mrs. West said they both looked strained and nervous. What she remembers of the conversation is that Antrim said to his wife that if she really wanted a divorce, she should make up her mind that day and let him know; and that he did not want a divorce himself, but wanted to please her. After Antrim left, his wife showed her mother the red marks on either side of her legs towards the thigh, which turned black the next day.

The husband's testimony was that he was making sixty-five dollars a week when his wife left. Aside from the fifteen dollars he sent her a short time after her departure, he did not contribute to her support or maintenance in the slightest degree. She fell and broke her wrist about Thanksgiving. The husband knew of this, but did not go to see his wife, nor communicate with her in any way, nor pay for her medical attention. He justified his neglect and default because of her absence from his home. On his cross-examination, the husband said that a few weeks before she broke her arm, he was convinced that their relation as man and wife was finished, and it was then that, even if she were willing to return, he had determined that he would not resume cohabitation.

The wife further testified that her husband came to see her again on December 26th, and, prefacing his conversation with the remark, "You wanted a divorce then but I want it now," offered and suggested to Mrs. Antrim that he would file a bill later on against her for an absolute divorce on the ground of abandonment, and that,

in order to obtain an absolute divorce, she should admit that the abandonment had occurred three years before November, 1935, but that she declined to agree to this falsification. The wife stated that she had been sick and hurt and had some bills for medical and other expenses, and desired to know what he would do with respect to their payment. His reply was: "I am in the money now but you are not going to get any of it."

Mrs. West was present and fully corroborates her daughter that the husband proposed this perjury, and that on its indignant rejection he said: "If I have to wait three years I may just as well wait twenty-three years and at the end of three years she will have to get it the best way she can, pay for it herself. I will pay for it now."

In his examination in chief, the husband did not mention this conversation. It was not until he was probed on cross-examination that he, notwithstanding some evasions, admitted the truth of the accusation in every material particular. To quote one of his answers on this subject: "I said this, I thought it might be possible, I did not know, but I thought it possible if we moved the date of the day she left me and moved it up, instead of waiting the whole three years that we might be able to get the divorce through quicker, but I suggested that before anything be done we go to see you. I did not want any attorney. I don't understand the thing at all." No comment need be made on an exculpatory profession of ignorance by one whose actions show an adequate comprehension of what was needed in the way of time and perjury to obtain an absolute divorce.

After this conversation, the parties had no further personal communications. On December 31st, the wife, through her counsel, made a demand upon the husband for her support, and fixed January 5th as the latest day for a reply. On January 15th the husband instituted these proceedings.

It appears from the preceding recapitulation of testimony that the parties are in substantial agreement on many of the facts, but are in conflict on others. In

reaching a conclusion on the conflicting testimony bearing on the controverted facts; the court must first consider the credibility of the witnesses, and the weight to be given to their testimony. The plaintiff and defendant are interested parties and are, with respect to much of their testimony, the only persons who could testify to their private acts and conversations. The defendant is unimpeached, but the plaintiff was shown to have attempted to corrupt the defendant and deceive the court in the matter of his divorce, and this frustrated effort at falsification of the ground for a divorce must be taken into adverse consideration in determining his credibility. An agreement to impose upon the court by false allegation and testimony is void. The combination of two parties to a marriage to procure by such methods a sentence of judicial separation is a conspiracy against justice and an attempt to practice a deceit upon the court. And, so, where an attempt has been unsuccessfully made by the plaintiff to procure such a combination with the defendant, and this appears on the proof, the chancellor will be vigilant in his scrutiny of the testimony on the part of the plaintiff and alert to detect its weakness. *Bishop on Marriage and Divorce* (2nd Ed.) vol. 2, secs 697, 699, 730, 251, 252, 266. *Schouler on Marriage and Divorce* (6th Ed.) vol. 2, secs. 1708, 1709.

On the record the husband appears to have testified with important reservations of unfavorable facts, which were later developed on his cross-examination to his detriment. In his testimony in chief, he excluded his last interview with his wife, in which he tempted her to falsify the facts of their separation. His denial of ever having used violence toward his wife is not supported, but his wife's accusation of specific acts of violence is corroborated by her mother.

After an analysis of all the testimony in connection with the considerations which affect the credibility of the witnesses and the weight of their testimony, the court has determined that the wife had no legal cause to leave her husband's domicile, and that such action was willful

on her part, but that the desertion by the wife was not against the will of the husband. The abandonment and desertion which are grounds for a divorce *a mensa et thoro* are not established unless there exist in concurrence an actual cessation of cohabitation, and the willful intent of the absent spouse to desert. If, however, it be shown that the plaintiff acquiesced or consented to the cessation of cohabitation, or committed such a breach of matrimonial duty as justified the desertion, the plaintiff is not entitled to a divorce. If the couple separate, or, having separated, continue the suspension of cohabitation by common consent, there is not in either the requisite intent in law to desert the other. The consent may be actual or implied. *Bishop on Marriage and Divorce* (2nd Ed.) vol. 1, secs. 1662, 1663, 1670, 1671, 1690, 1736, 1737; *Schouler on Marriage and Divorce* (6th Ed.) vol. 2, secs. 1629-1631; *Barclay v. Barclay*, 98 Md. 366, 371, 56 A. 804; *Moorsom v. Moorsom*, 3 Hagg. Ecc. 105. The application of these principles to the facts found will prevent a divorce being granted.

The conduct of the husband on the night his wife left was not indicative of a genuine objection to her departure. His consent and acquiescence in their parting, even while he was verbally expressing a desire for a reunion, are evidenced by acts and statements. In his first visit to her he assumed responsibility for the quarrel, expressed regret for its happening, and his willingness to make reparation by giving her a divorce, and thus introduced this subject for the first time for her consideration. His letter of September did not propose that they resume their broken cohabitation, but that they meet socially as a method of reviving her love, and, if this experiment should prove unsuccessful, it would be time then to arrange for their permanent separation. In September he stated to the mother of his wife that he did not desire a divorce, but wanted to please his wife in this regard. All these things were done and said before October, and are sufficient to establish his consent to and acquiescence in the abandonment, even though the hus-

band meanwhile had said he desired a resumption of married life. *Meldowney v. Meldowney,* 27 N.J.Eq. 328, at page 330; *Goldbeck v. Goldbeck,* 18 N.J.Eq. 42; *Sarfaty v. Sarfaty,* 59 N.J.Eq. 193, 45 A. 261.

His acquiescence and implied consent are even more clearly established by the attitude which he assumed about the time she met with the accident to her arm. It was then, according to his own admission, that he determined that he would not resume cohabitation, even though his wife desired it. In furtherance of this fixed decision, he went to where his wife was living, and informed her that she had wanted a divorce, and that he desired an absolute one. In order to secure it, he asked his wife to falsify the length of their separation to three years by setting back the date on which she had left.

In *Lynch v. Lynch,* 33 Md. 328, the case was for an absolute divorce, and the husband did not go so far as to conceive a fraudulent plan for divorce, but on proof that the husband, since the separation, upon being applied to by a friend of his wife to ascertain whether he would do anything for her, she being then sick, had declared that he would neither live with her nor have anything more to do with her, the court said: "Thus showing that the abandonment of the marital relation is not less deliberate and final on the part of the party complaining than on the part of the party complained against; and under such circumstances, clearly, no final divorce should be granted." *Tarr v. Tarr,* 164 Md. 206, 209, 164 A. 543.

It follows from these views that the bill of complaint of the husband must fail.

*Decree reversed, and bill dismissed, with costs to the appellant.*