SAUSE *v.* SAUSE

[No. 60, October Term, 1948.]

*Decided January 12, 1949.*

90

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, and HENDERSON. JJ.

*Hyman Ginsberg*, with whom were *Ginsberg & Ginsberg* and *Manuel E. Lefko* on the brief, for the appellant.

*J. Calvin Carney* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court No. 2 of Baltimore City denying the appellant a divorce *a mensa*, dismissing her bill of complaint, and disallowing a counsel fee to her solicitor.

The parties were married on October 3, 1942, having known each other from childhood. The appellee served in the United States Navy from February, 1942 until August, 1945, and saw active service in the European theatre in landing craft. Thereafter the parties resided at 204 S. Washington Street, Baltimore, Maryland, in a house owned by them as tenants by the entireties. Their infant daughter was born in March 1946. After leaving the Navy, the appellee worked for three months as a mail carrier, and then sporadically for his father in the "house repair" business. He made no effort to take training under the "G.I. Bill of Rights". On July 12, 1947, the father "fired" him. A few days later Mr. and Mrs. Sause went to the Phipps' clinic of the Johns Hopkins Hospital, where he was examined by a psychiatrist. On August 15, 1947, he packed up and left the home. They had ceased marital relations on August 1, when the husband told her that he was "through with" her. There seemed to be nothing in the wife's conduct that would justify, or even explain, his action, other than a statement that she "nagged" him, and they argued over the purchase of twin beds. For some time previous the wife had been working at the Western Electric Co.,

with his consent, earning $54 a week. She spent all her earnings on the upkeep of the house. Her mother, who lived next door, took care of the child while she was at work. She is 34 years of age, he is 37.

When the appellee left his own home he went to his father's. The latter became apprehensive about his son's mental condition and sent him to Dr. Truitt, a psychiatrist. After four visits, Dr. Truitt advised that he go to Seton Institute. His father paid for his treatment and expenses there. He was still there when the case was tried below.

The medical testimony indicates that the appellee was suffering from a genuine mental disturbance. Dr. Truitt gave his opinion that he was "a mental borderline case of a personality, certainly mentally sick, emotionally sick. * * * I felt he needed hospital care and arranged for his admission to Seton Institute. * * * I would say he was terribly confused and unable to intelligently and emotionally handle himself or his situation". He testified that the patient "did not seem to have any great ill feeling towards his wife * * *. He felt rather guilty about his situation, his married life." Dr. Mary D. Ely, a psychiatrist connected with Seton Institute, stated that while his condition had improved, he "requires further treatment and would probably not be able to earn his living and support his wife and child". Dr. Ely stated that "the technical diagnosis is psycho-neurosis, mixed type" which includes "a degree of nervousness and a degree of tension and anxiety which precludes effective working and carrying out of his life's work or duties". In response to questions by the Chancellor, she described the external symptoms of a neurosis, such as a "terrified expression; a tendency to be very indecisive about * * * simple things * * * a tendency to cower * * * and an anxious expression * * * very widely dilated pupils of his eyes, his expression".

The appellant testified that she thought "there was nothing wrong with Henry other than he was a bit lazy * * *. He could do a good day's work when he wanted to". However, she must have thought there was

a possibility of mental trouble when she accompanied him to the Phipps. Dr. Reifschneider, a surgeon and not a psychiatrist, who examined him at the instance of the Chancellor to determine whether he was able to appear in court, testified he thought Mr. Sause was "in fit mental and physical shape to be supporting his wife and child". He quoted the appellee as saying "if he could talk it over with his wife he could go back again with his wife and try to make a go of it, provided she tried to get along too". The Chancellor observed the appellee when on the stand and heard his testimony, which was rather confused. He either could not remember events leading up to the separation, or assigned trivial causes for it. He professed a desire to be reconciled, but didn't know whether he could "make a go of it".

Mere failure to support is not desertion. *Brunner v. Brunner,* 70 Md. 105, 16 A. 385. Nor is a mere separation, unaccompanied by an intention to permanently sever the marital relation. *Miller v. Miller,* 185 Md. 79, 42 A. 2d 915. On the other hand, the Maryland law does not countenance a severance of relations except for grave and weighty causes, of which incompatibility is not one, even though it may produce nervous and emotional strains of a pronounced character. *Bradshaw v. Bradshaw,* 189 Md. 322, 55 A. 2d 719. While a "competent will * * * is necessary to render [one] capable of desertion, * * * mere highstrong nerves, and unrestrained impulsiveness of a sane [person] would not, on the other hand, save the actions * * * from legal desertion". *Kruse v. Kruse,* 179 Md. 657, 663, 22 A. 2d 475, 478. The testimony in the instant case would not support a finding of insanity. But the question here is one of motive, rather than one of mental capacity. If the husband's departure was motivated by an honest desire to rehabilitate himself, it would hardly amount to legal desertion.

The wife's statements that the appellee was "through with" her, and did not intend to return, are contradicted by his statements to the Doctors that he had nothing against his wife and wanted to go back. The bill was

filed by the wife and resisted by him. She did not visit him at the Seton Institute, although she 'phoned him a number of times. She testified that she would have taken him back at any time until about two weeks before the trial, but now "I don't want him back, * * * I have given him enough chances. I have had enough". It was conceded at the argument that since the trial he has left Seton Institute and obtained work. What we said in *Ritz v. Ritz,* 188 Md. 336, 343, 52 A. 729, 731, 732, seems to be apposite here: "Marriage imposes upon the parties the duty to bear and forbear * * * and we think that the husband should have borne his wife's nervous afflictions for a longer period of time and given her the opportunity, as she suggested, to go away for a rest and see if thereby her condition would not have improved sufficiently for the parties to have continued their married life". This statement, of course, presupposes the existence of a real mental illness and not simply a nervous and irritable disposition or a desire to escape from an unhappy environment. *Brault v. Brault,* 189 Md. 175, 55 A. 2d 497. We think the chancellor was correct in denying a divorce *a mensa* upon the testimony before him.

This conclusion will not, of course, operate as a bar to other or further proceedings if one or other of the parties should refuse to become reconciled without just cause. But we think there was error in dismissing the bill, which prayed for custody of the infant daughter— Code, Art. 16 section 41. Custody should have been awarded to the appellant and jurisdiction should have been retained for the purpose of awarding support and maintenance of the child if circumstances should warrant.

The decree recites that no counsel fee was awarded to the solicitor for the appellant because when the court indicated it proposed to award $50.00 as counsel fee, the solicitor stated that he would refuse to accept it. We cannot find an abuse of discretion in the fixing of a $50.00 fee, when it clearly appeared that the appellee was penniless and under hospital care, and the appellant

94

had means of her own. The amount of an allowance may be reviewed on appeal, but counsel cannot be heard to complain of the disallowance of a fee which he refuses to accept. We find no error under the circumstances. In so holding we do not, however, suggest that application for the allowance of fees in the present appeal may not be in order.

*Decree affirmed in part and reversed in part, and remanded with costs.*