### SMOOT *v.* SMOOT

[No. 175, October Term, 1951.]

*Decided May 9, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Hyman Ginsberg*, with whom were *Louise Salzman* and *Ginsberg & Ginsberg*, on the brief, for appellant.

*Irvin S. Friedman* and *Alex Steinhorn* for appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree awarding an absolute divorce to a husband on the ground of constructive abandonment on the part of the wife. The bill was filed on June 18, 1951, reciting that the separation occurred in August, 1949. It did not pray for custody of the two children. The wife filed an answer alleging that the husband deserted her without just cause in August, 1949, but did not pray a divorce. The case was heard by the Chancellor in open court.

The parties were married in 1931. As he was earning a very small salary they lived in the home of her parents at 2607 East Oliver Street, occupying a room on the second floor. Her father died shortly afterwards. In 1935 her younger sister was married and also lived with her husband on the second floor. In 1940, the parties rented a house at 1341 Luzerne Avenue and moved there with their two children, one of whom, a girl, had been born in 1934, and a boy in 1937. They resided there for about a year and a half, but were unable to live within their means. He was working for a laundry company as a salesman, but lost his job as a result of shortages for which he was held responsible. At his suggestion they moved back to her mother's home. Conditions there were very crowded, as the sister and her husband occupied the second floor which they had converted into an apartment. The only sleeping quarters for the parties, their two children and her mother were the living room and dining room. During this period they paid no rent as they were paying off their debts.

In 1943, the husband went into the Navy where he served until 1946. For a time he was stationed in San Francisco and wanted her to join him there. However, he provided no funds, had no living quarters there, and she did not wish to move the children under the circumstances. He wrote her several affectionate letters during this period. When he returned from service, they continued to live with her mother under the same crowded conditions, although he obtained permanent employment with the Post Office and was earning a gross salary which increased from $2,800 to about $3,700 a year at the time of the trial. He slept on a day bed in the living room, where she occasionally joined him, she says, whenever he asked her. The wife slept with her mother in the dining room, where the children also slept on day beds. During this period the husband suffered from a nervous condition; in 1948 he was hospitalized for suspected ulcers.

The parties separated on August 17, 1949 under the following circumstances. They had been to Betterton for a vacation with the children. She testified he seemed moody and apathetic, but otherwise their relations were pleasant and normal. On their return, he had words with his mother-in-law, who sided with the wife when he tried to discipline the younger child. The next day he came home late in the evening; the next morning he said he was leaving. The wife urged him to think it over. He took his clothes and left, after giving her a lawyer's card. He admitted he had been to see the lawyer before the trip to Betterton. He never returned, but sent her $25.00 a week. Suit was filed by him two years later.

His explanation is that he left because he could not tolerate the crowded conditions and the domination of the mother-in-law. These conditions, of course, were largely of his own creation, within his power to correct, and not grounds for divorce. He testified he had previously tried to obtain a home of his own, apparently shortly after he returned from service, but the wife refused to leave her mother. This was flatly denied by the wife. She said they had often discussed obtaining more adequate quarters, but he wanted something far beyond their means. After the previous experience in a rented house, and the expense of the children, she refused to buy a house beyond their means. She did look for a house and selected one she though suitable, but he would not even look at it. He said he would not live in a row house or an apartment.

At the close of the testimony the chancellor delivered an oral opinion. He discounted the testimony about the refusal of the wife to move to San Francisco, and other events prior to his return from service. He commented on the fact that the wife had testified at the trial that she wanted a reconciliation and was willing to move to any home the husband could provide commensurate with his income. He urged the parties to meet privately and talk it over, while he held the case *sub curia*. If recon-

ciliation proved to be impossible, he said: "I will just have to make up my mind who to believe, Mr. Smoot or Mrs. Smoot. To put it again in a nutshell Mr. Smoot said he wanted to buy a home and have a home and she refused to leave her mother. She says she realized the situation there was not right. She wanted to have her own home but all Mr. Smoot ever did was talk about it, never actually got out and produced. If I believe Mr. Smoot, there certainly was ground for his leaving. No husband should be required to sleep over a period of years on a day bed in a parlor if he is willing and able to provide a home for his family. He is certainly entitled to have his wife in the bedroom with him and have the privacy that every married couple is entitled to. On the other hand, if I believe Mrs. Smoot, that all Mr. Smoot did was to talk about it and never act then I do not think a case of constructive desertion has been made out." For reasons that do not appear, a reconciliation was not effected. Three weeks later, the Chancellor, without making any findings of fact or filing any further opinion, signed a decree awarding the husband a divorce and ordering payment of $25.00 a week for the support of the younger child.

The appellee urges that a finding of fact on the issue stated is implicit in the decree, and invokes the well-known rule that the Chancellor's finding on an issue of fact and credibility should not be disturbed. We think, however, that several comments are in order. In the first place, the opinion seems to overstress the correlation between contentment and a given standard of living. Again, the issue as stated seems to assume that because the parties had separated one or the other must be entitled to a divorce. But this does not follow. The mere act of leaving would not in itself constitute an abandonment by the husband without a clear intention that the separation be permanent. *Sause v. Sause,* 192 Md. 88, 92, 63 A. 2d 632; *Flohr v. Flohr,* 195 Md. 482, 487, 73 A. 2d 874, 876. Nor would the fact that the wife was unwilling to leave her mother's home necessarily

amount to constructive desertion. *Buttion v. Buttion,* 189 Md. 305, 311, 55 A. 2d 839; *Bennett v. Bennett,* 197 Md. 408, 79 A. 2d 513. A husband's right to change the matrimonial domicile is not unqualified but depends on the circumstances. Cf. *Blair v. Blair,* 199 Md. 9, 14, 85 A. 2d 442, 445. A wife can hardly be put to a choice where the husband has not actually and in good faith provided an acceptable alternative. The undisputed testimony that at the time he left they had no money in the bank, or even enough to meet current bills, is a grave reflection on his good faith. The fact is that he had no particular house in mind, and any efforts he made to obtain one long antedated the separation. He did not even say why he was leaving, and it might well be contended that any previous refusals on her part had been condoned.

If we assume, however, that there was evidence to show an anticipatory breach of her obligation to follow her husband to a hypothetical house, it was nevertheless the husband's legal duty both to seek reconciliation and to accept a subsequent proper offer of reconciliation. "A refusal to renew suspended marital relations, without justification, constitutes desertion." *Dearholt v. Dearholt,* 178 Md. 405, 409, 13 A. 2d 538, 540. See also *Schofer v. Schofer,* 191 Md. 549, 554, 62 A. 2d 565, and cases cited. The testimony leaves no room for doubt that the appellant made repeated offers of reconciliation. She called him at the Post Office, but he told her he wanted a legal separation. She went to see him at the house where he boarded, but he would not let her in. In March, 1950, he came to see his son who was ill. The boy said: "Daddy, if you want a home for us why don't you get a home? We need one." The wife said if he would get a home she would come and bring the children. He said: "I wish you were common then I could take the children." The daughter, seventeen years old at the time of the trial, corroborated this, and testified she also begged her father to get a home for them. He said he "had no use for" her mother. So far from denying

this testimony, Mr. Smoot testified: "I realized then there was no reconciliation." The daughter was employed at the time of trial and earning $32.00 a week. She was willing to contribute to the support of a home. Mrs. Smoot repeated on the stand her offer to leave her mother and resume marital relations in a house of her husband's choice, but he refused.

We have indicated that "offers and refusals from the witness stand deserve a minimum of weight" and "direct personal communication, and not communications through counsel or other intermediaries or by mail or telephone, is a badge of good faith." *Hornstein v. Hornstein*, 195 Md. 627, 638, 75 A. 2d 103, 108. The offers in the instant case were direct, fully corroborated, and in obvious good faith. On the other hand, it is perfectly clear that, whatever his true motive which remains obscure, the husband had formed an unshaken resolve to sever the marital ties at the time he left the wife, if not before.

The Chancellor's opinion indicated a doubt that there were any substantial grounds for a divorce. He clearly stated that he thought there were no impediments to the resumption of marital relations. But we think he fell into error in attempting to force a reconciliation, rather than to passively appraise the efforts previously made by the parties. As we said in *Flohr v. Flohr, supra*, 195 Md. 488, 73 A. 2d 876: "It is not the province of the courts to settle marital disputes or to determine what husbands and wives should do in order to live harmoniously together. These are intensely personal matters which the parties must determine for themselves. What the courts have to do is determine the effects of actions that the parties have already taken and to adjudicate their legal rights based on these actions. In so doing, it is not the judicial province to encourage separations or to labor to find grounds for divorce where such grounds do not clearly appear. On the contrary, it has always been recognized that legal separations should not be decreed for light and trivial causes." We have also held

that it is error for a trial judge to grant a divorce on inadequate grounds merely "because he thought such a disposition of the case would be beneficial to the parties." *Smith v. Smith,* 198 Md. 630, 634-635, 84 A. 2d 890, 892. In any event, we think it is clear from the undisputed evidence that the husband, by the unqualified rejection of the wife's overtures after the separation, put himself in the wrong and that he is not entitled to a divorce on this record. The decree must be reversed and the bill dismissed.

*Decree reversed, with costs.*