## GIVNER *v.* GIVNER

[No. 60, October Term, 1952.]

*Decided January 9, 1953.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Eugene Hettleman,* for appellant.

*Jacob D. Hornstein,* with whom was *Bernard B. Feikin* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court of Baltimore City granting a divorce *a mensa et thoro* to Nettie F. Givner, the appellee, from her husband, Charles I. Givner, the appellant, and awarding her fifteen dollars a week as permanent alimony with a fee of one hundred dollars to her solicitor.

The couple, who were middle aged, were married on February 4, 1951, after having known each other but a short time, and lived together for approximately nine months. He moved into the home of the wife, a two-story house, where they occupied the first floor, the upper floor being rented to a tenant who passed through

the living room on the first floor to go to her apartment. The wife's father had a bedroom on the second floor also, although he used the bathroom and living room on the first floor. The husband left the wife and the home on three occasions before the final separation, in June, in August, and in September. On each occasion, the argument which precipitated his leaving was over a trivial matter, such as cold fish, the political leanings of his wife, and the fact that she had telephoned for him to come home from a tavern where he was playing cards.

The husband had been married before and had been divorced by his wife on the ground of cruelty. Preceding each separation in this case the husband, who seemingly drank and gambled with some regularity and when he pleased, would become quarrelsome, yell at his wife, bang on the table loud enough for the neighbors to hear, and call her a "truck horse" or a "Mack truck". On each occasion the husband effected a reconciliation and for two or three weeks thereafter, the couple apparently lived a relatively quiet married life. The final separation happened on the night of November 3rd. The husband says he came home feeling sick and that the wife and the father were listening to television in the living room. He went into the kitchen and laid down on three chairs. Feeling worse, he went outside and laid down in his car, and then, on the advice of a neighbor, purchased some brandy, which he took home, had a drink with his father-in-law, and went to bed. Later that evening, he asked his wife to have marital relations with him, and she refused on the ground that she was sick. Apparently she had been sick for almost a week. After her refusal, he said: "You have made me the happiest man in the world", packed his things and left the house. She interpreted this remark as meaning that he had been afforded grounds which would justify him to leave and perhaps to divorce her.

After some two weeks of separation, Givner inserted an advertisement in the newspaper, stating that he would

not be responsible for his wife's debts. About a month and a half after he left, he filed suit for divorce on the ground of constructive desertion. He said that both the advertisement and the suit were for the purpose of "waking her up", so that she would realize the seriousness of the situation, and would return to him. Soon after the final separation, he had rented an apartment at the Marlborough Apartments, apparently on a temporary basis, and he telephoned her to ask that she come there to live with him. He is still living there. His testimony is that he desired a reconciliation, and that he was perfectly willing to live with his wife anywhere, except in her home with her father there. He complained of the lack of privacy—the father had to pass within a few feet of their bed as he went to and from the bath—and that he could never be alone with his wife. His efforts at reconciliation were all on the telephone. One of the conversations apparently lasted as long as six hours and another two and a half hours. Why the wife endured these Marathon conversations is not clear and what the participants could have found to talk about for that length of time is likewise left to conjecture. The wife says that she did not want to hurt his feelings but, whatever the reason, only once did she avail herself of the happy opportunity, afforded by the telephone, as with television and radio, of disconnecting the electric current to avoid further listening. Except on one occasion, her description of the telephone conversations is that he kept saying they could not live together, and she agreed with him. She said that every time he called, she was "a nervous wreck for hours afterward". He would "get into a rage over the phone". On the final occasion he called, she says he "sounded like a madman. He called me all sorts of names, and he said, 'I am going to kill you—if I have to hang for it, I will kill you,' and I hung up on him. A few minutes later, he called back again. He said, 'I am going to come up and choke you. If you will be alive tomorrow morning, it will be a miracle. I am coming right up now.' And

I said, 'If you come, I will call the Police,' and he hung up."

It is not necessary to decide whether these conversations are distinguished by their length from the kind disparaged in *Hornstein v. Hornstein*, 195 Md. 627, 75 A. 2d 103, as badges of good faith in seeking reconciliation. Whatever the quantity of words from the husband, their quality as inducers of matrimonial reunion was evidently lacking, both in practical effect and in the eye of the law.

The Chancellor found that the husband left the home deliberately and without justification, and that the insertion of the advertistment as to the debts of the wife, and the filing of suit for divorce against her indicated that it was his intention to permanently sever the marital relation. He found further that those two acts were inconsistent with a reasonable or *bona fide* desire on the part of the husband to effect a reconciliation. He said: "A man who wants to become reconciled with his wife certainly does not file suits charging her with constructive desertion, knowing that the Sheriff will come around and serve papers on her. He does not put notices in the newspaper stating that he will not be responsible for any debts contracted by his wife." The Chancellor found that the husband's conduct met the test laid down by the cases decided by this court. They lay down the rule that to constitute desertion a ground for divorce, there must be separation of one spouse from the other without justification, either in the wrongful conduct or the consent of the other. The matrimonial offense of abandonment and desertion contains two inherent elements, (1) the ending of cohabitation, and (2) the intention of the offending party to desert. The two need not begin together, but desertion starts when they concur. *Miller v. Miller*, 185 Md. 79, 42 A. 2d 915; *Coleman v. Coleman*, 188 Md. 203, 51 A. 2d 673. It is the duty of the deserting party to seek to effect a reconciliation and to do so in good faith. *Miller v. Miller*, 178 Md. 12, 11 A. 2d 630; *Kidwell v. Kidwell*, 190 Md.

614, 59 A. 2d 204; *Schwartz v. Schwartz,* 158 Md. 80, 148 A. 259.

Whether the wife would have been justified in refusing to accept a genuine effort at reconciliation by the husband, it is not necessary to decide. In weighing this question, the fact would have to be considered that she had given him three previous chances in the face of the testimony that he was loud, coarse, abusive and parsimonious. He contributed only the food and eleven dollars a month toward the cost of the family establishment, and on one occasion docked his wife five dollars because she did not get up and give him his breakfast, although she was sick. Both of his matrimonial experiences point to his obvious unsuitability for the marriage state. Whether all this amounts to refusal to accept a sincere proposal of reconciliation under the test of *Schwartz v. Schwartz, supra,* and *Miller v. Miller,* 185 Md. 79, 42 A. 2d 915, *supra,* we do not determine. We agree with the Chancellor that the controlling point of the case is that the husband left without justification, and either then or shortly thereafter definitely intended to sever the marital relationship on as economical a basis as possible. This being so, there can be no justified claim, although the husband makes one, that the separation was at least voluntary on both sides. As was pointed out in *Miller v. Miller,* 178 Md. *supra,* the mere fact that a wife, whose husband is dissatisfied, finally accepts the inevitable and permits him to remain away, after reasonable efforts to make a go of the marriage, does not show that the separation was by mutual consent so as to bar her right to a divorce.

From the testimony as to the husband's financial resources and income, we find that the allowances to the wife of fifteen dollars a week as permanent alimony and of the counsel fee of one hundred dollars were proper, and the decree will be affirmed.

*Decree affirmed with costs.*