# WEINTRAUB *v.* WEINTRAUB

[No. 203, October Term, 1956.]

*Decided June 19, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ., and KINTNER, J., Associate Judge, Second Judicial Circuit, specially assigned.

*George E. Brown, Jr.,* for appellant.

*George W. White, Jr.,* with whom were *Buckmaster, White, Mindel & Clarke* and *George L. Clarke* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing complainant's, appellant's, bill of complaint for a divorce *a mensa et thoro.*

On May 21, 1956, the complainant, Lois Ellen Weintraub, filed a bill for a divorce *a mensa et thoro* against her husband, Sylvan Stanley Weintraub, respondent, appellee, in which she alleged that her husband on or about April 29,

1956, deserted her; that said desertion had continued uninterruptedly since that time and was the deliberate and final act of her husband; that there was no reasonable hope or expectation of reconciliation; and that her husband was employed as a manager of an apparel shop at a wage of $160.00 per week. She asked for custody of the two minor children of the parties, Barbara, age 4, and Steven, age 6, and for alimony *pendente lite,* permanent alimony, and support and maintenance for the two children, and for counsel fee.

Testimony was taken in open court before the chancellor. The parties were married in Baltimore on June 7, 1949. At the time of the hearing on October 30th and 31st, 1956, she was 25 years of age and he was 37. Until their separation on April 29, 1956, the parties lived at 3818 Bartwood Road in Baltimore. Respondent was employed as manager of an apparel store and claimed that his earnings were not sufficient for the purposes of his family. His indebtedness increased during the seven years of the marriage, he was heavily in debt, and the home was subject to first and second mortgages. He also owed money on his car, furniture, and for doctor's bills, and had borrowed $1,000.00 from his employer. In 1950 the respondent left the complainant over a petty incident. She said he slapped her on that occasion. After an absence of three days he was persuaded to return home. Shortly thereafter he had his wife sign a separation agreement. Complainant testified that, although they had little arguments, they got along "reasonably well". In December, 1955, the respondent suffered a heart attack and was hospitalized for six or seven weeks, and incapacitated from work until March 15, 1956. On the latter date, the first day he returned to work, the parties were seriously injured in an automobile accident, and both were in a highly nervous condition. According to his physician, Dr. Cohen, as a result he was in a very irritable mood, highly sensitive and depressed, but his cardiogram showed an improvement. Dr. Cohen advised the complainant to be patient with her husband and while eating he was to be as quiet as possible. On April 27, 1956, complainant stopped for him at the store about 6 P. M. When they arrived home his dinner was not quite

ready and she stayed outside for a short time speaking to a friend. When she came in he criticized her for not having his dinner ready, and argued with her the whole evening about it. She testified that finally his criticism became so severe that she decided to go to a moving picture show with a friend. He told her that, if she went out that night, not to come home. She went to the movies and returned about 12:45 A. M. The next day, April 28th, he became aggravated with her because she had not told him she was going to the doctor and because she had not had the car repaired as he had asked her to do. That evening they had further argument about who would get the newspaper for him. On April 29th Steven ran in and out of the house making some extra noise. She called to him to be quiet. The parties had a heated argument about the noise. She said at that time he told her that, if he killed her, he could prove temporary insanity and would not be held for it, and hit her across the face. She called her mother on the telephone. He called his brother, asking him to come over and told him he was going to leave his wife. The chancellor, who saw and heard the witnesses, in his opinion stated: "I accept a great part of the testimony of Mrs. Weintraub, if not all of it. * * * There is to me a very obvious discrepancy between the respondent's testimony in the Courtroom and the respondent's testimony by way of deposition." We must, therefore, give complainant's testimony much weight.

Respondent testified that he told his wife to be quiet and when she did not do so, he pushed her. Two of the husband's brothers and the wife's mother shortly arrived and the husband, after packing some of his clothes, went to his brother's home. Complainant and her mother testified that respondent said "he was leaving". Respondent testified that he had no intention of deserting his wife and children and felt that, if he did not leave, he would have another heart attack. That same afternoon he put an advertisement in the Evening Sun, to run for three or four days, stating that he would not be responsible for any debts unless contracted by him. The next day the complainant called Dr. Cohen and asked him to come to see her. She told him what had happened and the

next evening called his attention ·to the advertisement in the newspaper. After advice from someone, the respondent took the advertisement out of the newspaper the next day. Complainant heard nothing from the respondent until May 4th when he called her to talk over the situation. Dr. Cohen suggested a reconciliation. On May 5th the respondent went to see the complainant at their home. She said he came in the house in a fighting mood and asked whether she wanted him back. She attempted to, discuss the occurrences of the preceding weekend and she said he refused to be conciliatory in any way. He then took from his pocket the separation agreement which he had drawn in 1950, and which both had signed six years before, and said he had kept the paper all those years and "knew it would come in handy".

The respondent testified that he told his wife that he was sorry for the arguments, that they should take the children into consideration and settle down and she said she could not give him an answer at that time. He then pulled the separation agreement from his pocket. Sometime during the night of May 5th or 6th the respondent took the automobile, which was jointly owned by the parties, from in front of the house. On May 6th the respondent came to the house and gave her $20.00 and told her that it was for food for the children for the week. After this there were various discussions between the parties. He claimed that he wanted to come back but she would not discuss the matter with him. She, on the other hand, testified that he said nothing about reconciliation. Dr. Cohen testified that complainant wanted her husband to make the approach toward reconciliation. This does not seem unreasonable. On May 8th respondent came to see the children and she asked him whether she could use the car for a couple of days to take the children out. He refused to let her have it, saying it was his car, and left. On that day she first contacted her attorney. Shortly afterwards the car was repossessed by the finance company.

After May 8th the respondent called at the house about twice a week to see the children. Complainant claimed that he would not talk to her. He claimed that she always wanted an explanation of his conduct. For nine weeks prior to July

6th when the alimony *pendente lite* order was passed, the respondent paid the complainant $20.00 per week to cover all expenses for herself and the two children. On May 20th he came to the house to get some bills. Complainant testified that he told her he had never been so happy in his life, and, as he left the house called her "a ... .... liar" and asked her: "What about the bums you are running around with?" On May 25th he called her and said he wanted his insurance policies, that he was going to eliminate her name from them and substitute the children's names. He later got the policies and the change became effective on August 27, 1956.

Suit was filed by the complainant on May 21, 1956. She said that on May 27th respondent came to see the children but stayed for only three or four hours because one of them had the measles. She testified that during that time "he constantly told me that he was going to pin me down to somebody as long as I was going to drag him to court." She finally had to call her lawyer but did not ask the respondent to leave. On June 11th the respondent said he went to the house about 9:30 P. M. to obtain his income tax papers. She refused to let him in and he unlocked the door and walked slowly up the steps. She said he forced open the screen door, dashed up the steps saying: "I don't care if you are naked, I am coming up." He said he was going to spend the night in her bed. She said she became quite upset and called her attorney, Dr. Cohen, and the police. The police could not make him leave. She testified that, although he spent the night in the house, she overheard him tell Dr. Cohen that he had no intention of really staying that night. She said she then became afraid of the respondent because he "hollered" and threatened her. She then went to her mother's home with the children. She and the children stayed with her mother and father for the next three weeks. Because of her father's poor health and the crowded conditions she was forced to find accommodations elsewhere. She leased an apartment and had no income other than the $20.00 per week from her husband, and no furniture. He was living in the house. She arranged to take the furniture from the house on the date of the hearing on the alimony *pendente lite,*

when she knew he would not be at home. A stipulation was then entered into between the parties, and complainant moved back into the home with the two children, and respondent moved back to his brother's house. Respondent claimed that, while his wife had originally indicated her willingness to reconcile with him on condition that he apologize to her, at the trial on October 30, 1956, she stated that from the middle of June, 1956, she was unwilling to reconcile under any circumstances. She said up to that time he had made no sincere offers of reconciliation. He claimed that his conditions for reconciliation were that his wife should help him get rid of his debts, do the right thing at the right time, be a good wife and mother, accept his sickness and take care of him. Complainant testified that on several occasions he told her he would use his heart condition to win the case.

The chancellor, in his oral opinion, apparently given on October 31, 1956, stated that he accepted a great part of the testimony of the complainant, if not all of it. He was of opinion that the respondent actually left the complainant on April 29, 1956, although "he might well have had in mind an intention to terminate the marriage", he did not think this was "an abiding intention" but was "an ephemeral one." He was also of opinion that the respondent made no sincere effort of reconciliation and that such reconciliation should be accompanied by an apology for bad conduct. This was not given. Respondent was attaching conditions upon reconciliation, as if the wife had been guilty of misconduct. Respondent did not contend that his wife was not a good mother. Although the wife was impulsive at times, the chancellor found no misconduct on her part. He further said: "There are relatives of both of these litigants in the Courtroom. It is an unfortunate situation. The two of them have nice children, and I think the parties to this case are very respectable persons. Whether they can live happily together or not— I am going beyond the scope of the opinion at this time— whether they can live happily together or not is beyond me. I am not an expert in these matters. If there is any possibility that the relatives in the Courtroom could bring about a reconciliation it would be desirable. I am not going to state

as a finality what the decree would be. I would rather hold the matter for reflection and I would be glad to hear any discussion some other time that counsel might wish to have it." On December 14, 1956, he signed a decree dismissing the bill of complaint. From that decree the complainant appeals.

As contended by the respondent, marriage, of course, imposes upon the parties the duty to bear and forbear. *Ritz v. Ritz,* 188 Md. 336, 343, 52 A. 2d 729. Also, the mere act of leaving without intent that the separation be permanent does not constitute abandonment. *Smoot v. Smoot,* 200 Md. 216, 220, 88 A. 2d 465. Nor do courts grant divorces for slight or trivial reasons. *Evan v. Evan,* 200 Md. 473, 476, 90 A. 2d 178. Also, on appeal, the findings of fact by the chancellor based upon the evidence taken in open court will not be reversed unless it is clearly apparent that the findings are not supported by the weight of the evidence. *Brown v. Brown,* 204 Md. 197, 212, 103 A. 2d 856.

As above stated, the chancellor found that the respondent actually left the complainant on April 29, 1956. The evidence certainly justified that finding. He also found that there was no sincere effort for reconciliation made by the respondent. There was ample evidence to justify that finding. If one spouse leaves the other without cause and repents and proposes to renew the cohabitation and that other refuses, it constitutes desertion by the one refusing from the time of the refusal. However, the offer to return must be made in good faith, free from improper qualifications and conditions and must really be intended to be carried out in accordance with the performance of the duties of the matrimonial cohabitation. *Zukerberg v. Zukerberg,* 188 Md. 428, 433-434, 53 A. 2d 20, and cases there cited. Such offer must be such that it can be accepted without any reasonable sacrifice of self respect, health, safety or comfort. *Hite v. Hite,* 210 Md. 576, 581, 124 A. 2d 581, and cases there cited. As found by the chancellor, the respondent attached conditions of reconciliation upon the wife as if she had been guilty of misconduct. Also, as found by the chancellor, the conduct of the respondent in respect to the automobile was significant.

As stated in *Givner v. Givner,* 201 Md. 333, 93 A. 2d 563,

where a husband leaves a wife without justification and either then or shortly thereafter definitely manifests an intention to sever the marriage relationship, the wife is entitled to a divorce *a mensa et thoro*. The chancellor found in that case that the husband left the home deliberately and without justification, as in the instant case. He further found that the insertion by the husband of the advertisement as to the debts of the wife, as in the instant case, and his filing of a suit for divorce, which did not occur in the instant case, indicated his intention to sever the marriage relationship. As pointed out in that case, a man does not put notices in newspapers stating that he will not be responsible for any debts contracted by his wife, unless he intends to separate from her. The ending of cohabitation and the intention of the offending party to desert need not be simultaneous. In the instant case the wife and her mother both testified that at the time respondent left on April 29, 1956, he stated "that he was leaving". The law will not countenance the living apart of a husband and wife in Maryland except for grave and weighty causes. *Kline v. Kline,* 179 Md. 10, 15, 16 A. 2d 924. As evidence of the husband's intention to desert, on April 29th the wife said her husband threatened to kill her and struck her in the face. He admitted that he pushed her. At that time he said he was leaving for good. On the same afternoon he put the notice in the newspaper. He removed part of his clothing from the house. The fact that he gave his wife $20.00 per week for nine weeks for the support of herself and children, until alimony *pendente lite* was decreed, hardly showed an intention on his part to resume cohabitation. Mere high strung nerves and unrestrained impulsiveness of a sane person does not save the action from becoming a legal desertion. *Kruse v. Kruse,* 179 Md. 657, 663, 22 A. 2d 475; *Bradshaw v. Bradshaw,* 189 Md. 322, 325, 55 A. 2d 719. It is also significant in this case that the husband kept the separation agreement, signed in 1950, and showed it to his wife after he left her in 1956. From this action he must have contemplated his desertion for sometime. From the chancellor's opinion he was evidently hopeful that, through the actions of the relatives, these parties could be reconciled. As found by the chancellor, respondent's

bad conduct called for an apology. All his efforts for reconciliation were upon the condition that his wife had been guilty of misconduct, contrary to the finding of the chancellor. It is therefore obvious that no reconciliation could be effected between these parties.

We are of opinion that, on the facts as found by the chancellor, there was sufficient proof of intention to desert. The chancellor specifically found that the separation was not caused by any wrongful conduct on the part of the wife. He also found that, although the husband had seen the wife a number of times before the divorce suit was filed, he made no sincere effort at reconciliation. These findings of fact were sufficient to entitle the wife to a divorce *a mensa et thoro*. It was said in *Scheinin v. Scheinin*, 200 Md. 282, 293, 89 A. 2d 609: "Where a separation is not caused by any wrongful conduct on the part of the wife, she is entitled to a divorce if her husband has made no offer to resume cohabitation under such circumstances as would warrant a reasonable belief that matrimonial relations could be resumed without endangering her health or reasonable comfort. *Simmont v. Simmont*, 160 Md. 422, 153 A. 665." *Lombardi v. Lombardi*, 201 Md. 429, 432, 94 A. 2d 260. A decree for a divorce *a mensa et thoro* and custody of the children should be awarded the wife in this case, together with alimony and an adequate sum for the support of the children. The decree will therefore be reversed, and the case remanded for the passage of a decree in conformity with this opinion, and for the awarding of such sums as may seem proper for alimony for the wife and support for the children. The award of $300.00 counsel fee in the trial below appears adequate. No petition for counsel fee for the appeal was filed.

> *Decree reversed, with costs, and cause remanded for further proceedings as herein indicated.*