ZULAUF *v.* ZULAUF

[No. 15, September Term, 1958.]

*Decided October 28, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*George D. Edwards,* with whom was *David D. Merrill* on the brief, for the appellant.

*Claude A. Hanley* and *George M. Mullen* for the appellee.

HORNEY, J., delivered the opinion of the Court.

Bessie Lee Zulauf (the wife) filed a bill against Harry Zulauf (the husband) in the Circuit Court for Baltimore County for a divorce *a mensa et thoro* on the ground of abandonment and desertion. The husband filed a cross-bill for a divorce *a vinculo matrimonii* and, in the alternative, for a divorce *a mensa et thoro,* also alleging desertion and abandonment. The chancellor granted the husband a partial divorce and dismissed the wife's bill. The wife appealed from the adverse rulings.

The parties met in North Carolina during World War II. They were married at Sparrow's Point on July 26, 1946, and established a home in Baltimore County, where, except for a brief period, they lived together until May of 1957. The husband, a steelworker, was employed by the Bethlehem Steel Company. In 1956 the parties adopted Blake Wayne Zulauf, a three-year-old nephew of the wife.

In December of 1956 the wife went to North Carolina with her sister to visit their mother, who resided there. She took most of her clothes. The wife remained in North Carolina for about eight weeks. During that time the parties talked to each other every night by telephone, and frequently corresponded by letter. The husband requested the wife to come home several times, and made two trips to get her. The first time she was ill and, with the consent of her husband, extended her stay. On February 22, 1957, she returned with her husband to Maryland.

For two and one-half years prior to February of 1957, the

wife had refused to have marital relations with her husband. During most of that time he slept in another room. Only occasionally did he sleep with his wife. After she returned to Baltimore County from North Carolina she resumed marital relations with her husband for a brief time, but again refused on or about April 8, 1957, and continued to refuse until they finally separated.

The wife denied any intention to desert her husband and that she had refused to fulfill her marital obligations. Prior to the trip to her mother's home she told her husband she was in love with another man, but that the affair was over and she wanted time to think about it. There was also testimony that in 1955 she told her husband's adoptive mother he slept in the back room and she slept in the front room with the boy. On cross-examination, although she declared she loved children and wanted to have one, she admitted using contraceptives. Apparently she was afraid to bear children.

According to the wife's testimony, on the night before May 26, 1957, the husband packed his bag, and later that night they attended a dance at the American Legion Hall. The next morning, at about 5:30 a.m., while the wife was still asleep, he took his bag, left the marital home, and went to live with his mother.

According to the husband's version of the separation, the wife came into his bedroom, woke him up by shaking him and yelling he had made a fool of her, and ordered him to go up to Dundalk and find her shoe, which she had lost the night before. She reminded him again that was his last day in their home. She had told him on the previous day she would not put up with him any longer and that May 26, 1957, was the last day he could remain in the home. He went to Dundalk, found the shoe, and upon returning, found his wife asleep. He left her shoe and ten dollars, which was all the money he had in the house, and went to reside with his adoptive mother. Subsequently, the wife asked him several times to return, but he refused.

The wife also charged the husband had been cruel to the adopted son. And the wife's mother testified he beat the child often. The husband denied he had done either. On

the contrary he stated he had been kind to the boy, had taken good care of him and expected to continue to do so.

These appeals present five questions: (i) did the sojourn of the wife away from her husband for a period of eight weeks constitute desertion?; (ii) did the subsequent desertion by the wife revive the prior condoned desertion?; (iii) were the admissions of the wife sufficient corroboration of the husband's testimony concerning the desertion?; (iv) what weight and consideration should be given to the chancellor's finding of facts?; and (v) did the husband desert the wife when he left the marital home and refused to return when the wife sought reconciliation?

We will consider the fifth question first since it relates to the original bill of the wife against the husband. The wife based her right to a partial divorce on the fact that when the husband refused to resume marital relations with her he abandoned and deserted her. If it was the intention of the wife to really resume the marital relationship, and the offer of reconciliation was made in good faith, without improper qualifications and conditions, then the refusal of the husband to renew the suspended marital relationship, without justification, would constitute desertion. *Weintraub v. Weintraub*, 214 Md. 38, 132 A. 2d 847 (1957); *Hite v. Hite*, 210 Md. 576, 124 A. 2d 581 (1956); *Smoot v. Smoot*, 200 Md. 216, 88 A. 2d 465 (1952). However, the chancellor, who did not give any credence to the testimony of the wife or her mother, found as a fact that the wife was attempting to make the husband support her permanently, and, at the same time, escape all the responsibilities and obligations of the marital relationship, which we take to include a finding that the wife's offers of reconciliation were not made in good faith. The chancellor was convinced the evidence produced on behalf of the husband reflected the true circumstances of the marital status. There was an abundance of testimony as to his good character and trustworthiness. Since we must give due regard to the opportunity of the trial judge or chancellor to judge the credibility of the witnesses we are unable to rule he was clearly wrong when he ordered the original bill should be dismissed. Maryland Rule 886 a. The decree as to the

suit of the wife against the husband must therefore be affirmed.

On the contrary, the chancellor found the wife's conduct constituted desertion of her husband. In addition he specifically found the wife deserted her husband when she went to North Carolina and revived such desertion when—following the condonation upon her return to the marital home—she subsequently refused to continue to fulfill her marital obligations. But the chancellor was in doubt—and reiterated such doubt several times in his oral comments and written opinion—as to whether there had been sufficient corroboration of the husband's testimony to justify the court granting him an absolute divorce or a partial divorce. He finally concluded there had been sufficient corroboration—both as to the original desertion by the wife and her "failure to practice conjugal kindness" after the condonation—to justify granting the husband a divorce *a mensa et thoro*.

On the question of the "original desertion," we think it is clear there was no legally sufficient evidence that the wife deserted her husband. Abandonment and desertion as grounds for a divorce contain two inherent elements: (i) the ending of cohabitation and (ii) the intention of the offending party to desert. *Givner v. Givner*, 201 Md. 333, 93 A. 2d 563 (1953). See also *Thurlow v. Thurlow*, 212 Md. 222, 129 A. 2d 170 (1957); *Evan v. Evan*, 200 Md. 473, 90 A. 2d 178 (1952). Moreover, the intention to desert must be definite that the marital status shall no longer exist. *Miller v. Miller*, 185 Md. 79, 42 A. 2d 915 (1945).

If the original desertion was founded in part on the fact there had been a cessation of marital cohabitation during the period of two and one-half years prior to the trip to North Carolina, there was no sufficient corroboration of that fact. The adoptive mother testified the wife had told her the husband slept in a back room while she slept in a front room with the boy, but that statement, standing alone, was not sufficient corroboration. *Wysocki v. Wysocki*, 185 Md. 38, 42 A. 2d 909 (1945); *Jones v. Jones*, 186 Md. 312, 46 A. 2d 617 (1946). See also *Hodges v. Hodges*, 213 Md. 322, 131 A. 2d 703 (1957), and *Mower v. Mower*, 209 Md. 413, 121 A.

2d 185 (1956). Moreover, there was no proof of an intention on the part of the wife to desert. In fact, the testimony of the husband shows that he and his wife did sleep together occasionally during the period referred to.

The chancellor's finding that the wife deserted the husband in December of 1956 was based upon her trip to North Carolina at that time. We think, however, that her sojourn there does not support such a finding.

Assuming, as we must, that the original desertion was based primarily on the claim that the sojourn of the wife away from her husband for a two-month period constituted desertion, proof of abandonment and desertion was lacking. Apparently the trip was no more than a visit. There is some evidence of a difference between the parties—she wanted time to think over her love affair with another man which had ostensibly ended—that might have prompted the trip, but there was no indication the wife left with the intention of ending the marriage. Indeed the conduct of the parties while they were temporarily separated indicated they were still devoted to each other. They exchanged telephone calls every night, and letters on other occasions. If there was an estrangement there is nothing to indicate it other than the repeated entreaties of the husband for the return of his wife. But, as against this, there was evidence the husband consented to a prolongation of the separation when the wife became temporarily ill. Although there was a temporary ending of cohabitation there was no proof of an intent on the part of the wife to desert. See *Givner v. Givner, supra,* at p. 337. If the suspension of cohabitation was by mutual consent there could not be an intent to desert. *Antrim v. Antrim,* 169 Md. 418, 181 A. 741 (1935). We think the chancellor was clearly wrong with respect to the original desertion. Rule 886 a, *supra.*

Since we hold that the wife did not desert the husband when she went to North Carolina, we do not reach the next question as to whether the alleged "subsequent desertion" by the wife revived the so-called original desertion. There remain only the third and fourth questions. Other than certain admissions by the wife on cross-examination—which contra-

dicted her previous testimony denying she had refused to fulfill her marital obligations after her return from North Carolina—there is no corroboration of the husband's testimony that the wife, after a brief revival of the marital relationship, *again deserted* him by discontinuing such relations. Code (1957), Art. 35, § 4, provides in part that "* * * in * * * actions * * * for the purpose of obtaining a divorce, * * * no * * * decree [shall] be entered upon the testimony of the plaintiff alone; but in all such cases testimony in corroboration of that of the plaintiff shall be necessary."[1] Nevertheless, when a case is contested, and there is no possibility of collusion, only slight corroboration is required. *Harp v. Harp,* 198 Md. 485, 84 A. 2d 895 (1951); *Hodges v. Hodges, supra.* Corroboration, however, cannot be dispensed with. *Hodges v. Hodges, supra.* Corroboration, except as limited by Code (1957), Art. 16, § 32, and Art. 35, § 4, *supra,* may be found in evidence of admissions by the other spouse, but such admissions, unsupported by other corroborative proof, should be received with utmost caution. *Schriver v. Schriver,* 185 Md. 227, 241, 44 A. 2d 479 (1945). In this case, however,—where the wife denies in one breath she had refused to fulfill her marital obligations, and admits in the next breath that she did—it is clear the admissions are not trustworthy, and should not, therefore, be received. *Schriver v. Schriver, supra,* at p. 241. See also *Slacum v. Jolley,* 153 Md. 343, 351, 138 A. 244 (1927). Since there was no corroboration of the husband's testimony as to the subsequent desertion, the chancellor was clearly wrong when he granted the husband a partial divorce. Therefore, so much of the decree on the cross-bill as granted the husband a divorce must be reversed.

In making these decisions we are not unmindful of the rule that the findings of fact of the trial judge or chancellor will

---

1. Note that Maryland Rule 1190 f, which will become effective January 1, 1959, states: "A final decree of divorce shall not be passed upon the testimony of the plaintiff alone, nor shall the admissions of a defendant in an action for divorce be taken of themselves as conclusive proof of the facts charged as the ground of the action, *but in all cases testimony of a person not a party in corroboration of the plaintiff shall be required.*" (Emphasis added).

not be set aside unless they are clearly wrong. *Hodges v. Hodges, supra.* Indeed, we affirmed such ruling in the instant case on the original bill despite the fact it was twice necessary to declare the chancellor's rulings were clearly wrong on the cross-bill.

That part of the decree which (i) awarded custody of the adopted child to the adoptive wife, (ii) reserved certain visiting rights to the adoptive father, and (iii) provided that he support the child, is affirmed, the parties having consented thereto. Code (1957), Art. 16, § 25.

> *Order dismissing original bill affirmed; decree on cross-bill reversed in part and affirmed in part; the costs to be paid by cross-plaintiff.*